Judge Simpsom
delivered the opinion of the Court.
The Town of Lexington was established by an act of the Virginia Legislature, passed in the month of May 1782. Its boundary was represented as containing seven hundred and ten acres of land, composed of six hundred and forty acres of unappropriated lands, and seventy acres contiguous thereto being part of a military survey made for John Floyd, The act establishing the town vested the title to the seven hundred and ten acres in John Todd and six other gentlemen, as Trustees, and empowered and required them to make conveyances to those persons who had settled on the lots within the town, and also to the purchasers of lots that had been previously sold. The trustees were also authorized to lay off such parts of the land embraced in the town, as had not been laid off and settled, into lots and streets, and sell and dispose of the same for the benefit of the inhabitants of the town.
Some years previous to the passage of the act establishing the town of Lexington, the then inhabitants *156 hád determined to locate a town at its present site. Under the laws of Virginia they were authorized to appropriate six hundred and forty acres of vacant land for that purpose, which was done, and by a contract with Col. John Todd, who was the owner of John Floyd’s military survey of two hundi’ed acres, they purchased seventy acres out of the survey of two hundred, lying adjoining the six hundred and forty acres. By a contract among the original inhabitants of the town, each one of them was entitled to an in-lot and an out-lot.
Col. John Todd was one of the original settlers of the town. He was killed at the battle of the Blue Licks in August 1782, and left a daughter, his only child, then a little upwards of a year old. After his death his widow acted as his executrix in conjunction with his brother Robert Todd, who acted as his executor-. The provisions of his will under which they acted are unknown, the will having been destroyed at the time thfe Clerk’s office of the Fayette County Court was consumed by fire. His daughter intermarried with James Russell who died about the year 1802. Some few years after her husband’s death, she being the owner bf the balance of the survey of two hundred acres in the name of Floyd, adjoining the town of Lexington, which she had inherited from her father, laid it off into streets and lots, some of the streets being a mere extension of the streets of the town, and designated by the same name, and sold the lots to various individuals, and conveyed them to the purchasers, naming the streets as such in the deeds, in describing the boundaries of the lots conveyed. The limits of the city of Lexington were extended so as/ to include those lots and streets, and she conveyed some of the streets to the Trustees, but two or three of them, were not embraced in the deed, and have never been conveyed. She afterwards in the year 1826 or, 1827, intermarried with Robert Wickliffe.
In the year 1832, Robert Wickliffe and his .wife instituted this suit in chancery against the city of Lexington-, claiming:
*157 A surplus of twcnty-onc acres in the seventy acres purchased by the town from Todd in his lifetime.
An in-lot and an out-lot, to which Todd was entitled as one of the original settlers of the town.
The streets not embraced in the deed executed to the Trustees by Mrs. Wicldiffe, before her marriage with the present complainant, and that have been included within the city limits.
A small strip of ground called Locust street, about sixteen feet wide, and several hundred feet in length, outside of but adjoining the original boundary of the town.
The Circuit Court denied the relief prayed for, and dismissed the bill; and the plaintiff in error, has prosecuted a writ of error for the reversal of the decree.
The precise boundary of Floyd’s two hundred - acre survey cannot be determined with anyr degree of certainty, by the testimony in the cause. The extent of the surplus in the seventy acres depends upon the position of the survey, but although its boundaries arc not conclusively established, it may be assumed with safety, that the boundary laid off to include the seventy acres, contains several acres more than that quantity.
The town was surveyed and laid off into streets and lots in the year 1783, by Robert Todd, the brother, of John Todd. He was employed to do it by the.Trustees. His survey designated the boundary of the seventy acres, which boundary formed a part of the town boundary, and has been recognized as such ever since, and-the land inside of it has been held by the town, and claimed as a part of it from that period until the present time. The last of the purchase money for the seventy acres was paid in the year 1785, to the executors of John Todd, after his death.
Under these circumstances it is contended on the part of the city, that the claim to the surplus in the seventy acres is barred by time, admitting that any surplus exists.
The claim is certainly prosecuted at a very late period, More than half a century had elapsed after the *158 town was established, before the present suit was instituted. The contract with Todd in relation to the seventy acres, has become a mere matter of tradition. ■ All certain knowledge of its terms and stipulations has been lost in the past. Whether it did or not define the boundary of the seventy acres is unknown. Time has involved all that relates to this matter, in impenetrable obscurity. There is no reason however, to doubt that the boundary of the town as fixed and defined by the survey made in 1783, was identical with the one contained in the plat, which was before the Legislature ol Wrginin, when the act was passed establishing the town, if any alteration had been made, it would have been known to some of the persons then residing in the town. No such change of boundary is alluded to by any of the witnesses, although if it had occurred, it was a circumstance well calculated to excite their attention, and make a permanent impression on their memory. A different boundary bad been some years previously contemplated by the inhabitants, and a survey made for that purpose by Wm. Pendleton, but that boundary did not contain by some hundreds of acres, the quantity of land included within the town limits by the act establishing it, from which it conclusively appears that an abandonment of that plan had occurred, and another one had been adopted at the time the application was made to the Legislature of Virginia to establish the tciwn. The exact boundary of the town as originally defined, and more particularly designated by the survey of 1783, must have been known to Todd when ' he sold the seventy acres, and the sale was made so as to embrace the land within that boundary.
Where lend is conveyed for the purpose of a town, and the town is laid off, lots sold, and tho’ there may be a surplus con veyed, the only relief would be a compensation for the excess, not for the land itself.
*158 Whether the sale of the seventy acres was a sale in gross or by the acre, does not appear. If it were 'a sale in gross the excess in the quantity, considering the time and circumstances of the country, and the value of the land when the contract was made, might not authorize the interposition of a Court of equity to grant any relief. But if it were a sale by the acre, as the *159 contract was made for the express purpose, that the land sold should form a part of the town, the establishment of which |he parties then contemplated, th,e only redress the vendor could conscientiously claim, or that a Court of equity would afford him, after the town had been established according to the design of the parties, would be a reasonable compensation for the surplus land. To decree to him a re-conveyance of the surplus land itself would be not only inconsistent with the object of the purchase, but with the manifest intention of the parties to the contract, who obviously contemplated the appropriation of the whole of the land to the establishment of a town, from which purpose it could not have been withdrawn without inflicting a serious injury upon the inhabitants. As then, the vendor only had a right to a reasonable compensation for the surplus land, and it was not claimed until a full half century had elapsed after the sale was made, although it might have been asserted at any time, by the executors of the vendor after his death; the claim is presented at too late a period to be available, even if the plaintiff in error could maintain a suit for it in his own name without making the personal representative a party. Besides for aught that appears, the claim to compensation for the surplus may have been adjusted and settled in 1785, when the last of the purchase money was paid to the executors of the vendor; and that such a settlement was then made might be presumed, as the claim had not been subsequently set up or asserted, although many years had elapsed, until the present suit was instituted.
But it is too late to claim compen sation for surplus land after a lapse of 50 yeats
But if the vendor could in equity have demanded a re-conveyance of the surplus land, the lapse of time would be equally fatal to the claim. The act of 1782, establishing the town, vested the legal title to the land in the Trustees. Todd being at the time a member of the Legislature of Virginia must be presumed to have assented to the act, and was consequently bound by its provisions; indeed there is no doubt that it was passed at his instance. Whether the legislature could or *160 not vest the title in the Trustees, to the seventy acres, which had been previously granted by the State of Virginia to Floyd, is immaterial. Todd veis the owner of the land; he procured the passage of the act, and it purported to vest the title in the Trustees. The trustees of the town and their successors in office, have held and claimed under that title ever since the town was .established. They have not looked to Todd or his heir for a completion of their title by a conveyance, but as they had a right to do, have held the land adversely to their vendor and all others from that period. Unless then', the daughter and heir at law of Todd, labored under some disability that saved her right from the operation of time upon it, it was barred many years previous to the institution of this suit. But as her first husband died in 1802, and she was then of full age, more than twenty years elapsed before her intermarriage with Wickliffe, during which time she labored under no disability. And as this suit was not commenced until about thirty years after the death of her first husband, her right to the surplus land if any ever existed, was then barred by the lapse of time.,
, The claim to the town lots is resisted upon the ground that an in-lot and an out-lot designated as those belonging to John. Todd, were sold after his death by Jane Todd, his widow and executrix, and the lots conveyed by the trustees to her vendee. This defense is established by the testimony.
It is contended by the plaintiff in error, that the lots thus conveyed were not those which had been allotted to Todd, and were considered'as his, but lots which-had been given to his widow after his death; and if they were the same lots that he wa" entitled to, that his executrix had no power to sell them, nor were the trustees authorized to convey the title to the purchaser.
It clearly appears that Jane Todd disposed of four lots, two in-lots and two out-lots, all of which were conveyed by the trustees to her vendees. Two of those lots were the same that were known and designated as belonging to her husband, John Todd, as one of the *161 original settlers of the town. The others seem to have been given to her as a mere matter of favor by the trustees. As Todd’s will was destroyed by fire, and its contents have not been proved, it does not appear whether as executrix, she had power to sell or dispose of the town lots belonging to her testator. If, however, no such power existed, the heir at law, by the assertion of right to the lots against the vendees, within a reasonable and proper time, might have obtained a reconveyance of the legal title. But the failure to do it does not authorize a claim against the trustees for other lots, in place of those thus conveyed. The lots to which Todd was entitled, as one of the original inhabitants of the town, having been allotted to him, all claim on that ground was thereby satisfied, and no right existed to any lots except those thus set apart for him. If the trustees of the town conveyed the lots to those who had no right to them, although the act was wrongful, and amounted to a breach of trust, yet it conferred no right on the heir at law to demand other lots, although it may have rendered the trustees liable for the value of the lots, so improperly conveyed by them. But if such a liability was incurred by .the Trustees, it cannot be enforced at this late period, more than forty years having elapsed after the execution of the deeds by them, before this suit was instituted.
Lapse of time does not bar a suit to enforce a direct express & subsisting trust of a purely equitable character; but it does bar suits for violation of trusts where the object is redress for the injury resulting from the violation of a trust.
It is argued however, that in cases of trust there is no limitation, and that the lapse of time does not bar this claim against the city. This doctrine however applies alone to cases where there is a direct, express and subsisting trust, of a purely equitable nature, and not to cases where the trust which once existed has been violated, and a suit is brought to obtain redress for the injury resulting from the breach of trust. Had the title to the property still remained with the Trustees or their successors in office, they would have held it in trust for those entitled to it, and the doctrine contended for, would then have had a direct application in a proceeding against the Trustees in a Court of chancery, to compel them to convey the legal title. But when they ‘ *162 had conveyed away the legal title wrongfully, what trust existed between them and the rightful owner of the lots'? The trust had ceased by the execution of the conveyance. The act by which it was terminated had imposed a new liability upon the Trustees; but that liability was not in the nature of a trust either expressed or implied. The trust had been openly renounced, it no longer subsisted, but in its stead a liability had arisen of a different character, and one that had to be enforced, if at all, within the time allowed by law for redressing similar injuries, by a resort to a proper tribunal for that purpose.
It may however be remarked as it regards these lots, that a presumption might be indulged, either that the will of John Todd authorized the widow, as his executrix or devisee, to dispose of them, or that she had done it with the consent of her daughter during her infancy, and after she had arrived at full age, had paid to her the price she had obtained for them. This presumption would seem to be sanctioned by the daughter’s having acquiesced for so long a time in the sale made by her mother, of which as well as her father’s right to the lots as one of the eai’ly inhabitants of the place, she must have been informed, as she resided all her life in or near the town of Lexington.
The claim to the streets in that part of the city that was extended over the land of Mrs. Wickliffe, which she had laid off into lots and streets, and sold and conveyed the lots to various .purchasers, is resisted upon the ground that by the act of dividing the land into lots and streets adjoining the town, and corresponding with the streets of the town in width and in name, and selling the lots to purchasers, referring in the deeds made to them to the streets thus laid off, and making them the boundary of the property sold and conveyed, she dedicated the streets to the use of the public, and placed them beyond her power and control.
It cannot be doubted that the situation of the lots with reference to the adjoining town, and the proposed *163 extension of some of its streets so as to enable the proprietors of the lots when sold, to have ready and open access to the town, and the laying out of other streets to effect the same object, and to afford all the advantages resulting from theuse of streets within a town, operated as a strong inducement to the purchase of the lots, and afforded to the proprietor of the land by the enhanced value of the lots, a full compensation for the land given up to be used as streets. Nor can it be doubted that every purchaser of a lot acquired an interest in the streets, not only as an evidence of the position of his purchase, but also as a medium of communication that increased the value of his property and afforded all the advantages and facilities that might be deiived from their use as public thoroughfares. And this right acquired by the purchasers of lots was not the mere privilege of using the streets themselves, but a right to have them kept open to the use of the public, free from all claim or interference of the proprietor inconsistent with that use; (Rowan’s Exec’s, vs Town of Portland, 8 B. Monroe, 237.)
A dedication of ground forslreets will be presumed when the owner of land adjoining a town lays off and sells lots on streets extended from the streets of the town, and designating the lots as on such streets, &c: (8 B. Man., 237 l A parol dedication may be made of private property to public use: (Bar clay vs Howell, 6 Peters; Trustees of Dover vs Fox, (9 B. Monroe, 201.)
The deeds made by the proprietor to the purchasers of the lots, furnish the most conclusive proof of the facts necessary to sustain the rights of the purchasers to their full extent. When the deeds were made, the town had been extended so as to include the lots and streets within its limits. The deeds describe the lots as being in the town of Lexington, and bounded by the streets of the town, giving to them at the same time their appropriate names. This designation of them as streets in the town, by the proprietor, must be regarded as a conclusive dedication of them to that purpose, not depending upon implication merely, but established . by express testimony of the most permanent and unerring • character. A dedication of land for public purposes can be made by parol, and established by parol testimony; Barclay vs Howell’s lessee, (6 Peters,) Trustees of Dover vs Fox, (9 B. Monroe, 201.) Here however, the fact of a dedication, rests upon written evidence *164 under the hand 'and seal of the proprietor. Testimony too, so plain and direct, as to the object and intention 0f P)0th seller and purchaser, as to leave no room for doubt that the ground laid off for streets was set apart and dedicated to that use. That dedication gave value to the lots and made them vendible, and the corresponding right to the use of the streets, in its most comprehensive form must be regarded as having passed to the purchasers by the sale and conveyance of the lots.
The fact that the legal title to some of the streets has not been conveyed by the proprietor to the Trustees of the town, cannot impair the right of the purchasers or their grantees or the public at large. If the dedication did not per se operate to transfer the title to the Trustees of the town, still the proprietor held it as a Trustee, subject to this public use, and was as much bound to maintain it and preserve it from all disturbance, or diminution, as public Trustees would have been; (Rowan's Ex’r, vs Town of Portland, supra.) Nor does the fact that a conveyance of some of the streets was made to the Trustees of the town, impair the right to the others, or create a presumption against the existence of such a right. That conveyance to the Trustees was made several years after the sale and conveyance of the lots; and it is obvious from the testimony, that the omission to convey some of the streets was casual and not intentional, but that the deed would have been executed by the proprietor had it included all, instead of a part only of the streets.
The only remaining question relates to the small slip of land, sixteen feet wide, claimed by the city as Locust street.
About the year 1785, Mrs. Todd sold to Robert and John Parker, a lot of land on the South side of Main street, adjoining but outside of the town boundary, reserving however, sixteen feet between the lot sold and the boundary of the town as a pass-way from Main street to a Spring at some distance and on a branchy for the benefit of herself and her tenants who occupied her *165 land in that vicinity. By the terms of the sale by Mrs; Todd to the Parkers’, her daughter was to convey the title when she arrived at full age, which was done by her. This sale embraced all her land South of Main street, and down to the branch on the bank . of which the Spring was situated. This narrow strip of land was the only direct pass-way between her property on the South of Parker’s purchase, and her property North of Main street, as well as a pass-way to the Spring-After the death of her first husband, and .before her intermarriage with Wickliffe, she sold all or nearly all of her lots on the North side of Main street, immediately in that vicinity. By these sales she effectually deprived herself of .all right to the exclusive use of the Spring and pass-way, and must be regarded as having in effect appropriated them to the use of her. grantees far the purposes for which they were originally reserved. The ground could not have been used as private property without interfering essentially with their right to the use of it as a pass-way, and although this' right is not based upon any express appropriation of it to their use, yet an appropriation of it to that purpose may be implied from its original design, its situation, its necessity, and its uninterrupted use and enjoyment by them for more than twenty years. At first it seems to have been intended as a pass-way mainly for' the benefit of the residue of her lands, and no doubt contributed to their sale. As the neighborhood became thickly settled by her tenants and purchasers, its use became more common and public, and it had in fact been used as a street of the town for at least thirty . years before the present suit was commenced.
This strip of ground was at an early period called Locust street. It was marked upon a plat of the town by that name as far back as 1808, if not previously. The right of the public to its use as a street or pass-way was unquestioned and uninterrupted, until this suit was instituted. The direct proof as to the object in leaving it undisposed of, its continued and undisturb *166 ed appropriation to that object, in connection with the time that has elapsed since it was first designated as a pass-way, authorize the inference of its dedication to the use of the purchasers of the lots in that neighborhood. For all practicable or useful purposes it would be of little value as private property. But to the owners of lots in the neighborhood especially, and to the public generally, its use is important, and that use by having been long continued has become a right, to sustain which, a grant might be presumed, if one were necessary for that purpose. If the proprietor had intended to withdraw it from the use for which it was at first designed, why was it not sold and.conveyed as private property, when all the other land adjacent to its termination at Main street had been granted away? Because it would have been a violation of that implied understanding in relation to its use which most manifestly existed, when the sales of the adjacent land was made. It was therefore left undisposed of, open to the use for which it was originally intended, and has thus remained ever since, furnishing a cogent argument in favor of the conclusion that it had been dedicated to the use of the grantees of the land in its neighborhood. Under these circumstances it must now be regarded as one of the streets of the city, the effect of the dedication being a virtual appropriation of its use to the public.
Wickliffe for plaintiff; Robinson and Johnson for defendants.
Wherefore the decree dismissing the bill is affirmed.