CASE 23—PETITION EQUITY—JUNE 24.

5bu401
116  629
5bu401
116  629

# McKinney, &c., vs. Griggs, &c.

APPEAL FROM MADISON CIRCUIT COURT.

1. In 1854, Moberly, in consideration of two hundred and twenty-five dollars, conveyed to Griggs, Owens, Marsh, and Norris a house and two and one half acres of land, situated near a house of religious worship of a congregation of the Methodist Episcopal Church, South. The object of the purchase was, that the property should be used as a parsonage, and occupied as a residence by the minister in charge of said congregation; and, in pursuance of a parol arrangement, the consideration paid was mostly raised by contributions, and refunded. This property was occupied and used as contemplated from the date of the purchase, except at intervals, up to 1865. During the recent war, about sixty-five members of the congregation, including Griggs, Owens, and Norris, severed their relations with the Methodist Episcopal Church, South, and erected a new house of worship, at which they organized themselves as a congregation, in connection with the Methodist Episcopal Church of the United States. They left about thirty-seven members in the old congregation, who continued to adhere to the Methodist Episcopal Church, South, and kept up their organization, and retained exclusive control of the old house of worship. Griggs, Owens, and Norris (Marsh having left the State) asserted ownership to, and obtained possession of, the parsonage and lot. Appellants, as trustees of the old congregation, brought this suit for the recovery of the property and a conveyance. The circuit court adjudged that the restoration of the money paid by plaintiffs was the only relief to which they were entitled. That judgment is reversed, and a judgment for restoring the possession is ordered.

2. The purchase and appropriation of property as a home for the minister of that congregation, whoever he might be, according to the rules and discipline of the religious denomination with which the congregation was connected, was a dedication of the property to the use and benefit of all those who then composed that organized congregation, or might constitute it thereafter.

McKinney, &c., vs. Griggs, &c.

3.  A dedication of land for public purposes may be made by parol, and be established, by parol evidence. (*Trustees of Dover vs. Fox*, 9 *B. Monroe*, 200; *Wickliffe vs. City of Lexington*, 11 *B. Monroe*, 155; 9 *Cranch*, 292; 6 *Peters*, 431.)

4.  The reason for exempting a dedication of property from the rules of law applicable to a contract of sale, seems mainly to be, that, while in a sale there is a transmission of right from a vendor to a vendee, in whom the title can rest, a dedication consists in devoting it to the use of the public generally, or of some particular class or society.

5.  It is not essential that the title shall be vested to the use intended, as the fee may remain in abeyance for want of a grantee capable of taking; but the dedication will preclude the party making it from reasserting any right, so long as it remains subject to the use to which it was made.

6.  A dedication made as in this case, for the use and benefit of a particular organized community or society, must be restricted in its enjoyment to the purpose for which it was made, and cannot be diverted to another and different object, unless, by the division or disruption of that community or society, a partition or apportionment of the property is authorized by express law.

7.  "Schism or division," as contemplated by subsection 4 of section 3, chapter 14, Revised Statutes (1 *Stanton*, 236), imports no more than a separation of the society into two parts, without any change of faith or ulterior relations.

8.  The "Methodist Episcopal Church of the United States," and the "Methodist Episcopal Church, South," are judicially known, since 1845, to have been distinct, separate, and independent organizations.

9.  The appellees, and others who dissolved their connection with the society of which they were members, and the entire ecclesiastical body (Methodist Episcopal Church, South) of which it was a part, and united with another and distinct religious organization (Methodist Episcopal Church of the United States), cannot be regarded as a *party* within the meaning of the statute (*Revised Statutes, subsec. 4 of sec. 3, chap.* 14, 1 *Stanton*, 236), occasioned by a schism or division of a society, and entitled to a proportion of the use of the property.

S. TURNER,                                    For Appellants,

                    CITED—

     7 *B. Mon.*, 494; *Gibson vs. Armstrong.*

     1 *Bouvier's Law Dic.*, 386, "*Dedication.*"

McKinney, &c., vs. Griggs, &c.

BURNAM & CAPERTON,                          For ·Appellees,
                        CITED.

5 *Mon.*, 408; *Brown, &c., vs. East.*

3 *Marshall*, 24; 1 *J. J. Marsh.*, 403.

2 *Marshall*, 106; 3 *Marshall*, 246.

JUDGE HARDIN DELIVERED THE OPINION OF THE MAJORITY OF THE COURT, JUDGES ROBERTSON AND PETERS CONCURRING, AND CHIEF JUSTICE WILLIAMS DISSENTING:

On the 4th of March, 1854, Thomas S. Moberly and wife conveyed a dwelling-house and lot, containing two and a half acres of ground, to Jonas Griggs, James Owens, John Marsh, and Hamilton Norris, for the consideration of two hundred and twenty-five dollars. The property was situated near the house of religious worship of a congregation of the Methodist Episcopal · Church, South, of which the grantees in said conveyance were members, at or near a place called *Texas*, in Madison county.

The object of the purchase appears to have been, that the property should be used as a parsonage, and occupied as a residence by the minister in charge of said congregation; and in pursuance of some parol agreement, the price which was paid to Moberly was mostly raised by contributions and refunded to Griggs, Owens, Marsh, and Norris; and from the purchase of the property until about the year 1865, it continued to be so held and used, except during some short intervals. When it was not occupied by the preacher of the congregation, it was rented out; but the property does not appear to have been purchased or held for the use of the church generally, or of the conference or circuit to which that particular congregation was attached, but specially for. the use of *that* congregation as a residence for its minister, who was required annually to account for the use

of it, as so much paid him of his salary by the congregation.

During the recent civil war, the congregation of said church, at Texas, became disrupted, and about sixty-five of its members, including Griggs, Owens, and Norris, severed their relations with the Methodist Episcopal Church, South, and erected a new house of worship, at which they organized themselves as a congregation in connection with the Methodist Episcopal Church of the United States. Their withdrawal left only about thirty-seven members of the old congregation, who continued to adhere to the Methodist Episcopal Church, South, and kept up their organization and retained the exclusive control of the old house of worship. In the meantime, however, Griggs, Owens, and Norris (Marsh having removed from the State), asserting claim to the parsonage and lot under the deed from Moberly, obtained the possession of the property, and denied the right of those who remained of the old congregation to use or control it.

The appellants, as trustees of the old congregation, brought this action, seeking a judgment for the recovery of the property and a conveyance of the title, which was resisted by the defendants.

The circuit court, regarding the plaintiffs' claim to recover the property, as within the interdiction of the statute of frauds, adjudged that they were not entitled to further relief than to have restitution of so much of the money originally paid for the property as had been contributed by the plaintiffs and those they represented; and from that judgment this appeal is prosecuted.

As we construe the facts of this case, we do not regard the claim of the old congregation as resting on a contract, the enforcement of which is prohibited by the statute referred to. But the purchase and appropriation of

the property as a home for the minister of that congre-
gation, whoever he might be, according to the rules and
discipline of the religious denomination with which the
congregation was connected, was a *dedication* of the
property to the use and benefit of all those who then
composed that organized congregation, or might consti-
tute it thereafter. And the doctrine is well settled, and
has been long and uniformly recognized, that a dedica-
tion of land for public purposes may be made by parol,
and be established, by parol evidence. (*Trustees of Dover
vs. Fox*, 9 *B. Mon.*, 200; *Wickliffe vs. City of Lexington*,
11 *B. Mon.*, 155; *The Town of Pawlet vs. Clark, et al.*, 9
*Cranch.*, 292; *City of Cincinnati vs. The Lessees of White*,
6 *Peters*, 431.)

The reason for exempting a dedication of property
from the rules of law applicable to a contract of sale,
seems mainly to be, that while in the latter case there
is a transmission of right, from a vendor to a vendee, in
whom the title can vest, a dedication consists in devoting
it to the use of the public generally, or of some particu-
lar class or society. And it is immaterial to the validity
of the grant whether it be gratuitous or for compensa-
tion, or whether the object be to subserve public conve-
nience, as by the donation of ground for a street or a
highway, or a charitable or religious purpose, in the
appropriation of ground for a cemetery or church, or, as
in this case, a residence for the minister of a particular
congregation, as one of the means of procuring his ser-
vices. Nor does it seem to be essential that the title be
vested to the use intended, as the fee may remain in
abeyance for want of a grantee capable of taking. But
the validity of the dedication does not depend on this:
it will preclude the party making the appropriation from
reasserting any right over the land — at all events, so
long as it remains subject to the use to which it was

made. ( *City of Cincinnati vs. The Lessees of White,* *supra.*)

But, for obvious reasons, a dedication made, as in this case, for the use and benefit of a particular organized community or society, must be restricted in its enjoyment to the purpose for which it was made, and cannot be diverted to another and different object, unless, by the division or disruption of that community or society, a partition or apportionment of the property is authorized by express law.

Although the appellees, and those who withdrew with them from the old organization at Texas, were, while they remained, a majority of that body, when they severed their relations with it, and with the aggregate Methodist Episcopal Church, South, of which it was a part, they ceased to be members of the community to whose use the property was devoted; unless, by their withdrawal together, and reorganization as a congregation in connection with the Methodist Episcopal Church of the United States, they so retained their identity and unity as a party in the division of the society as to preserve their former rights in it, according to the fourth subdivision of section 3 of chapter 14 of the Revised Statutes, which provides, that "in case a schism or division shall take place in a society, the trustees shall permit each party to use the church and appurtenances for divine worship a part of the time, proportioned to the members of each party."

Did the withdrawal and reorganization of the appellees, and those co-operating with them, constitute a schism or division in the society according to the intent and meaning of the statute, or was it a mere reduction of its members, as if the withdrawing members had separately withdrawn or been expelled?

A *schism* is defined by lexicographers to mean, "in a general sense, division or separation; but *appropriately*, a division or separation in a church or denomination of Christians, occasioned by diversity of opinions; *breach of unity among people of the same religious faith*." And it is used in the statute in connection with the word "*division*," which certainly imports no more than a separation of the society into two parts, without any change of faith or ulterior relations.

But the meaning of the statute is further indicated by the requirement that "the *trustees* shall permit *each party* to use the church and appurtenances," &c., clearly contemplating a division of a society on account of differences among themselves, without any disruption of the relations of either party to the denomination of Christians with which the whole society was connected. And this is our construction of the statute. Independent of authority on the subject, there are reasons which seem to sustain this conclusion so patent as to render their elaboration useless. An opposite construction of the statute must inevitably lead to a recognition of the right of any part of a religious society to discard its faith, doctrine, and organization, and affiliate with any antagonistic sect, or stand aloof from all established religious denominations, and still be entitled to share equally with their former brethren in the use of their church property, provided they shall not have been excommunicated for immorality, which, by a provision of the statute, would terminate the rights of excluded members.

It is said, that although the appellees and their associates withdrew from the society at Texas, they were still Methodists, and that they united with the Methodist Episcopal Church of the United States; but

it is proved in this record, and a fact, moreover, which this court knows judicially as a part of the ecclesiastical history of this country, that, since the year 1845, that body, and the Methodist Episcopal Church, South, have been distinct, separate, and independent organizations.

But the question we are considering has been heretofore substantially decided by this court. In the case of *Shannon et al. vs. Frost et al* (3 *B. Monroe*, 253), one of the questions decided was, whether a part of a congregation of Baptists who had been expelled for alleged "non-conformity and contumacy," but against whom, as the opinion states, there was "no proof of immoral conduct in either the popular, the ethical, or the biblical sense," were still entitled to the use of the church for a time proportioned to their numbers, under the provisions of the act of 1814 (2 *Digest*, 1347); and the court held, that said statute did not apply to the case in any respect. One of the provisions of the act was, that "if any schism or division shall take place in said congregation or church, for any other cause than the immorality of its members, nothing in this act shall be so construed as to authorize said trustees to prevent either of the parties so divided from using the house or houses of worship for the purposes of devotion a part of the time, proportioned to the numbers of each party. The court said, in the opinion referred to, that "not being now *members* of the church to whose use the ground was conveyed, the appellants seem no longer to be entitled to any beneficial interest in that property, nor to any other right which this court can either enforce or recognize." The whole tenor of the decision in that case shows that the conclusion of the court did not rest on the fact of expulsion, but upon the ground that the appellants had ceased to be members of the church.

While it is true that the property in controversy was not acquired in the usual form of conveyance recommended in the discipline of the Methodist Church, and in this and some other respects there is an apparent difference between the essential facts of this case and those of the cases of *Gibson, &c., vs. Armstrong, &c.* (7 *B. Monroe*, 481), and the case recently decided by this court of *Humphrey, &c., vs. Burnside, &c.*, yet in this case, as in those, the property was, by the nature of the terms and trusts on which it was acquired, appropriated to the use of the beneficiaries as a local society of Methodists, governed by certain rules and discipline, which, in this case, were those of the Methodist Episcopal Church, South.

In the case of *Gibson, &c., vs. Armstrong, &c., supra,* this court, in considering the relations of the local society with the general church, as affecting the rights of individuals in property secured to its use, said, with reference to the rules, discipline, and laws of the Methodist Episcopal Church, that "we discover in them no sanction for the idea that a minority of one of the societies of the church, separating itself from the major or organized portion, and assuming at its own mere will a new and independent organization, can, in its corporate form, claim any right of occupying their former house of worship against the will of the remaining body, which, retaining the original organization, with the same officers and head, or their regularly appointed successors, and preserving the same position in the general organization, has, in point of fact, and in view of the law, these satisfactory evidences of its being the true society entitled to the use."

And in *Humphrey, &c., vs. Burnside, &c.*, lately decided (4 *Bush*, 215), the same principle is recognized and applied

in the construction of section 3 of chapter 14 of the Revised Statutes; and with these decisions the case of *Hadden, &c., vs. Chorn, &c.,* 8 *B. Monroe,* 70, is in harmony on this question.

The construction we have given to the fourth subdivision of said section of the statute seems to the majority of this court, the CHIEF JUSTICE dissenting, to be not only according to the conclusive weight of authority, but such as the language of the statute itself requires; and while it may operate with apparent hardship in isolated cases, we do not doubt that an opposite construction would lead to the dismemberment of religious societies, and become a fruitful source of litigation and strife between their adhering and seceding members for the possession of property dedicated to their corporate use on one side, and its appropriation to different objects on the other.

We are of the opinion, therefore, that the appellees, and others who dissolved their connection with the society of which they were members, and the entire ecclesiastical body of which it was a part, and united with another and distinct religious organization, cannot be regarded as a *party,* within the meaning of the statute, occasioned by a schism or division of a society, and entitled to a proportion of the use of the property.

In considering this aspect of the case, we have regarded the property in contest as appertaining to the church, although the statute more directly and certainly relates to houses of worship.

It seems to us the plaintiffs were entitled to a judgment, restoring to the congregation represented by them the control and use of the property in contest, for the purpose for which it was dedicated.

Wherefore, the CHIEF JUSTICE dissenting, the judgment is reversed, and the cause remanded, with directions that a judgment be rendered in conformity to this opinion.

McKinney, &c., vs. Griggs, &c.

CHIEF JUSTICE WILLIAMS DELIVERED THE FOLLOWING DISSENTING OPINION:

The facts in this case are few and simple, complicated with but little or no contrariety of evidence.

In March, 1854, Moberly desired to sell his small tract of land and appurtenances of about two and a half acres, within or adjacent to the town of Texas, in Madison county, and near the church edifice, belonging to the Methodist Episcopal Church, South, in which the congregation of said church at Texas worshiped; and the minister in charge, and some of the members, desired to purchase it as a parsonage for said congregation, but were tardy in making up the necessary funds. It was then agreed that Jonas Griggs, James Owens, Jno. Marsh, and Hamilton Norris should, and they did, purchase it with their own means, at two hundred and twenty-five dollars, and took the title to themselves as individuals, but with the understanding, that when the congregation should refund to them the purchase price, they would convey it to trustees for the benefit of said congregation for a parsonage.

This property continued to be so used, save at short intervals, when not needed for a minister in charge of the congregation; and doubtless members of the congregation and others, from time to time, made up and refunded the money to these purchasers and holders of the legal title, save some four or five dollars. The Rev. J. G. Bruce, the then, and for several subsequent years, Presiding Elder of the district in charge, fully explains the reasons why the deed had never been made to trustees for the church. He says there had previously been difficulties about parsonages; therefore, he advised the purchase to be made, and title taken to a joint stock

company, and not to the Methodist Episcopal Church, South, as this would place it under the direction of the quarterly conferences of the district; but that they should have the title so made as to remain private property, at least for that congregation; that subsequently, the question was several times agitated in the quarterly conferences—some advocating the transfer of the title to trustees for the Methodist Episcopal Church, South, which he always opposed, and which the district conferences had uniformily voted down, because they understood it had been purchased with the means made up by individuals, and was to remain as the private property of the congregation, and not become the property of the general church, as was their general policy. The title thus remained in the original vendees, whilst it was always used as a parsonage, when needed by the ministers in charge, until, since the late war began, when, like many other congregations, unfortunate dissensions grew up in this society, until, in the year 1865, to use the very common but expressive language of many of the witnesses, "it split up," a very large majority withdrew, and subsequently organized a society under the auspices of the Methodist Episcopal Church of the United States, or better known as the old church organization.

These two congregations, now bearing the proportion of thirty-seven to one hundred and fifty members, and as both societies have had accessions since the division, it is not improbable that their proportions were relatively about the same then; for, though some of the witnesses do say they suppose the minority numbered from thirty-seven to forty, and the majority about sixty-five, at the time of the separation, yet the minister in charge, who holds the church book, fixed the exact

number from it at thirty-seven, when his deposition was taken; and all agree that they have had accessions, whilst it may be possible that the majority have had a greater *pro rata* increase.

The title of the church edifice and lot being in the church at large, the majority left the minority in the undisturbed possession, control, and use of it; but as the title of the parsonage was not so, and as the grantees went with the majority, they claim it exclusively, and having possession, this suit in equity was brought to compel a surrender of the title and possession to the minority.

The court referred the case to the master to ascertain what part of the purchase price the individual members of the minority had paid, and which was found to be twenty-one dollars and fifty cents; and for this judgment, together with their costs, was granted them, and which they seek to reverse. Waiving all questions as to dedication to pious uses, and as to whether the statute of frauds and perjuries apply to the case, but resting the case alone upon the congregational rights of these beneficiaries, and whether the minority, who paid almost nothing for this property, after getting the entire church edifice and lot, which is doubtless worth greatly more, is also to have the parsonage by a rigid, and as I think, a too narrow construction of the statute, let us proceed to examine the obvious meaning and intent of the Legislature, and the natural, philological, and legal meaning of the terms used in the statute.

The statute of 1814 merely provided, that in case of schism or division of a religious society, the trustees holding and controlling the trust property should not prevent the respective parties from the use of the property alternately, according to their respective numbers.

Under this act no rights, as it was construed by the courts, were declared; therefore, when a schism or division occurred, the respective rights of the parties were adjudicated as though no such statute existed. But when our statutes were revised, in the year 1850, very different language was used, and *rights in the respective parties were declared*.

By *subsec.* 4 *of sec.* 3. *chap.* 14, 1 *Stanton's Rev. Stat.*, 236, it is enacted, that " in case a *schism* or *division* shall take place in a society, the trustees *shall permit* each party to use the *church* and *appurtenances* for divine worship—*a part of the time*, proportioned to the numbers of each respective party." And by subsection 5, "*the excommunication of one party by the other* shall not *impair such right*, except it be done *bona fide on the grounds of immorality.*" These sections, when taken in connection with section 3, which authorize any society of Christians to hold not exceeding fifty acres of land "for the purpose of erecting thereon houses of public worship, public instruction, a *parsonage*, a graveyard, and a horse-pond," legally places all such erections on the same footing, and to be governed by the same rules, under the same conditions, limitations, and rights.

Now what was the intent of the Legislature when it enacted this *pro rata* right in the respective parties on a *schism* or *division* of a society? The philological meaning of the term "*schism*," as defined by Webster, is—

" 1st. In a *general sense*, division or separation; but *appropriately*, a division or separation in a church or denomination of Christians, occasioned by a diversity of opinions; breach of unity among people of the same religious faith."

Whilst the same author defines "*division*"—

"1st. The act of dividing or separating into parts any entire body.

" 2d. The state of being divided.

" 3d. That which divides or separates; that which keeps apart; partition."

The common philological meaning of the statute, that, " *in case a schism or division shall take place in a society,*" is exactly equivalent to saying, that in case a society shall *separate, divide,* or become *partitioned,* each party is to use the church without any reference as to whether it shall have any other or external ecclesiastical relation, or if so, with whom. And if anything else were necessary to show that the legal significa- tion of these terms were of the same identical meaning, this is most clearly manifested in the fifth section, which also saves alike rights of the respective parties, though the one should excommunicate the other, save that this be done in good faith for immorality.

Now it is quite apparent, however this may be done for schismatical doctrine, and however regular may be the expulsion, and however deprived the party may be of all the church privileges as members, yet, when done for other than immoral conduct, it cannot affect their property rights. Nor did the Legislature intend to or really perpetrate the absurdity of keeping the expelled party from the. enjoyment of all ecclesiastical relations, by debarring them, on pain of forfeiture, from joining any other than the one they may be so excluded from.

The whole history of religious controversy in this State alike forbid this absurdity. The Baptist Church had met with several disruptions, and a very formidable one in the separation of a large part of their members now known as " Christians." The Presbyterians had divided into Old and New School and Cumberlands. The Meth-

odist had divided into the Methodist Episcopal, and Methodist Episcopal, South, and Protestants; all the offshoots forming new and different ecclesiastical relations, and from which sprung many angry law suits, most generally resulting in great injustice, owing to the limited operation of the statute of 1814, often leaving an insignificant few, who still held to the old organization as the entire beneficiaries of valuable church property, erected by the substance and means of the deprived majority.

With this limited construction of the statute of 1814, the history of these controversies, and these gross injustices, can it be doubted what the Legislature meant by this statute of 1850? It was to relieve the courts and the parties of this iniquity, this injustice, this tyranny and oppression, perpetrated in the name and under the guise of religion. Nor are the rights of seceding parties, any more than expelled ones, in the least dependent on continued membership in the same society; but this fifth subsection was added by way of a prudent saving, and equivalent to adding to the fourth subsection: neither shall the expulsion of one party by the other deprive it of the right herein secured, unless this be done in good faith for immorality.

The sense of the two sections, taken together, is simply this: In case a schism or division shall take place in a society, the trustees shall permit each party to use the church and appurtenances for divine service a part of the time, proportioned to each party; and the excommunication of one party by the other shall not impair such right, except it be done *bona fide*, on the ground of immorality. This fifth subsection declared no new right in the expelled party, but preserved the right declared in the fourth subsection to the schismatical party, unless expelled for immorality.

Now how can this be construed as reserving this right to either party, on condition that it shall remain in the same ecclesiastical relations? Did the Legislature intend to perpetrate the absurdity and mockery of securing the beneficial rights then existing of parties who should differ as to their religious tenets or administration of discipline or other cause, not involving moral dereliction, by saying: when you thus divide, the joint property procured by your joint means shall inure to each party of beneficiaries, according to numbers; and you will not be required to worship together, but may do so on different days, under the ministration of different officers; but you are not to sever your ecclesiastical relations?

The words *"schism"* and *"division"* were not used as equivalent to *dissension*, which, says Webster, means "disagreement in opinion, usually a disagreement which is violent, *producing warm debates or angry words, contention, strife, discord, quarrel, breach of friendship and union."* This word would have given the exact idea, that, notwithstanding these things, their respective rights are to still depend on their ecclesiastical unity, though in feelings, heart, sentiment, and for every essential religious purpose, they be totally estranged. But to suppose the law-makers used the words *schism* and *division* as equivalent to *dissension,* is to impute to the revising committee, three of the most distinguished lawyers of the State, and the whole legislative assembly, a monstrous ignorance of the meaning of terms, and to give this statute a most unnatural operation, producing the most absurd results, far less innocent than its inefficient prototype of 1814. Beside, as without the statute, the respective rights of mere dissentients would be just what this construction of the statute makes them, what earthly

motive could there have been in its enactment; for no civil court would invade the precincts of the church, and determine its controversies upon questions of faith, discipline, or morals, and adjudicate which party was in the right or wrong? But it was for this exact case of *division, separation,* or *partition* of the congregation or society, that the rights in the joint property were to be preserved by this statute. This society had a schism, growing out of the disturbances and disasters of the late war, which created a division, separation, or partition, much the larger part going off or withdrawing; but their rights vested whilst they were members and beneficiaries, which the statute preserved intact, and prevented from being lost by the division, separation, or partition, and being so preserved, could not be forfeited by their uniting with another ecclesiastical organization.

This court, at its last term, in *Gartin, &c., vs. Penick, &c.,* held, that the seceding members of a Presbyterian Church, known as the "Declaration and Testimony" party, did not lose their interest in the Bethel Union Church by their withdrawal from the ecclesiastical organization to which they had before belonged, but from which, on account of schism, they had withdrawn, leaving the remaining part of their local congregation still within the old organization and under the same officers, whilst they connected themselves with a different ecclesiastical body and jurisdiction. (*Gartin, &c., vs. Penick, &c., ante,* 110.)

The following quotation from the majority opinion, by Judge Robertson, is made to show that their rights were not considered as dependent on still continuing the same ecclesiastical relations, either internally or externally:

"The inevitable conclusion is, that the General Assembly itself forced the dismemberment of the Presbyterian Church, by acts which are void for want of higher au-

thority. And consequently, even if appellants held their interest in the church property by the tenure of adherance to the assembly, a severance of that connection by the unauthorized acts of the Assembly cannot affect the title to the property. They are still, in every essential element of identity, the same ' Bethel Union Church,' as always hitherto."

There might be more reason for saying that the General Assembly has lost its identity. It is certainly not what it was always before the war. By its belligerent antislaveryism and ·political propagandism, it forced *a division* of a once American and once homogeneous church into *two sectional and ·alien* churches, and the disruption of the union between itself and many dissenting churches of the Northern section; · and its changed conduct has, without any constitutional amendment, practically made innovations in its Confession of Faith and its Constitution of Government. In this way, and by its exscinding resolutions of 1867, *it compelled a dissolution of ties of government and allegiance* between itself, as the organic head of the church, and *the appellants, as a reorganized and independent church.*"

This withdrawing portion of the Bethel Union Church had never been exscinded, but had voluntarily withdrawn and joined a different ecclesiastical organization. The exscinding resolution referred to was applicable to the ministers and officers who had signed the "Declaration and Testimony," and refused to recant, but still abided by it.

The rights of the seceders in that case to participation in the church property was secured by a unanimous court. The CHIEF JUSTICE was for applying the·statute to the case, though he did not agree with the majority of the court in their reasoning and arguments; therefore, he delivered a separate opinion.

It will be observed that the statute assigns only one isolated cause of forfeiture, to-wit: for expulsion in good faith for immorality; so that the civil courts can inquire into but the one cause of schism, division, or disruption; it being all sufficient for them to know that there has been such schism and division in the society, and then divide the property *pro rata*, according to the numerical strength of the respective parties.

This most wholesome and benign statute should be applied equally to either and both sides, without inquiry or solicitude as to which political or 'religious party they may belong. It is sufficient to know that the statute applies, and, by its equitable provisions, that it will prevent either side from sequestrating and taking the property of the other, and unjustly converting it to their own purposes, and this, too, under the guise of religion, faith, duty, and right. This is so foreign from the ethical teachings of our great masters in equity jurisprudence, and the exalted equity therein taught, and so utterly at war with my conceptions of the teachings of the Divine Master, whose suffering, life, and doctrines form the most perfect and sublime system of justice and morals ever deigned by God to man, that a conforming spirit would seem to demand the liberalization of the just conceptions of the Legislature in this enactment, rather than restricting and rendering it inefficient by a narrow and rigid construction. Having applied it to what is conceived to be, essentially, just such a case, in favor of the "Declaration and Testimony" Presbyterians, fairness and equality would seem to demand it should be applied to the Methodist Episcopal members—as seceders from all churches, societies, or congregations, on account of schism or division, should be alike protected and governed by the same legal and equitable rules; for no

favorite church establishment is known to our Constitution and laws.

Whatever, therefore, may be the inapplicability of this statute, when the property is in the ecclesiastical organization at large, as much of it is in both the Methodist Episcopal Church and Methodist Episcopal Church, South, and understood to be in the Catholic and Episcopalian, yet, when the property belongs to the local society or congregation, it must apply, or be wholly incapable of performing its intended mission.

Believing that neither law nor justice gives this entire property to this small non-contributing minority, but that this would violate the letter and spirit of the statute, and be wholly inequitable, this, my dissent, is entered.