Barker, J.
With a view to a full understanding of the question considered and determined, in disposing of the pending motion, and to prevent misconception on the part of persons interested in this controversy, it seems necessary to make a full and complete statement of the facts disclosed in the proceedings and set forth in the affidavits. In essential matters there is no dispute. There is nothing in controversy but legal propositions.
There exists in this State and nation a large body of Christian people who are known by the denominational name of Presbyterians. Of the origin, growth, numbers, influence and particular faith and creed of this religious society, it is notimportant to make mention, but as to its form of government, customs, rules and discipline it will be necessary hereafter to make inquiry.
At Dunkirk there is a religious society belonging *365 to this church. From its earliest organization, it con-nected itself with, and became subordinate to, the higher judicatories of the Presbyterian Church. Many years ago this society was incorporated under the general statutes of this State, being chapter 60 of the Laws of 1813, and the several acts amendatory thereof, assuming the corporate name and title of “The Trustees of the First Presbyterian Church of Dunkirk, B". Y.5’ The incorporators in the certificate made and filed, declared themselves to be persons “belonging to a church in which divine worship is celebrated according to the rights of the Presbyterian Church.”
This corporation still exists and possesses and has title to real estate of the value of twenty thousand dollars and upwards, upon which there Is a church edifice, in which up to the time of the commencement of this action the members of the said church and congregation held religious meetings.
The plaintiffs are members of the said religious-society and of the corporation, and entitled to vote for trustees.
The defendants, Fullager, Colman, Hallock and Hequembourg, are now members of the board of trustees and a majority thereof. The defendant, Edward P.. Adams, when the injunction order was issued, was acting as the pastor in charge of the said religious society and congregation. Mr. Adams was duly, after the rites and ceremonies of the Presbyterian Church, ordained as a minister of the gospel, and regularly installed over this society.
In the summer of 1880, he was, by the action of the Buffalo Presbytery, of which body he was a member, deposed from his holy office on a charge of unsouncL ness in faith and doctrine.
Mr. Adams utterly disregards the action of the ecclesiastical tribunal which condemned and deposed *366 him, and claims the right to officiate as pastor in the Presbyterian communion and to perform all the offices of a minister of the gospel. The other defendants as trustees defend Mr. Adams, justify his position, and maintain him as is pastor over the society and congregation, open the church for his ministrations ; he occupies the pulpit as formerly, no wise changing his attitude toward the communicants of the church or the people of the congregation.
The position of Mr. Adams and of a majority of the trustees in sustaining him is concurred in by a majority of the members of the religious society and of the congregation at large.
The plaintiffs in the action represent the views of the minority. They file the bill in their own behalf and for the benefit of all others who belong to the church and congregation, who like themselves are in opposition to the attitude of the defendants.
Upon these facts the plaintiffs seek to restrain the trustees, as officers of the corporate body, from opening the church and suffering Mr. Adams to occupy the pulpit as minister over this congregation, because being, in fact, deposed from the holy office of minister, it is contrary to the discipline, rules and usages of the Presbyterian Church for him to continue that relation with the society. That it is wrong, an offense to their 'religious convictions, to be compelled to receive from a deposed minister spiritual instruction or the sacraments recognized by this denomination.
The trustees have not sought as yet to sever this society from the ecclesiastical relations which it held at the commencement of this unfortunate controversy with the higher judicatories of the Presbyterian government; but insist that their action is defensible and loyal to the faith and polity of the Presbyterian Church. That the attempt of the Presbytery to depose Mr. Adams was unjust; without good and sufficient *367 reas'on; that he is true and sound in faith and doctrine; that the adherence which they and a majority of the congregation manifest towards Mr. Adams is from motives and convictions entirely consistent with their faith as Presbyterians which they have not relinquished.
This statement of facts, together with the position of the parties, brings the mind of the court to a consideration of the legal propositions which are necessarily involved in the controversy-. The principal question and the difficult one arises out of the argument made in behalf of the defendants, that the civil tribunals have no jurisdiction over the matter in dispute ; that it is purely an ecclesiastical question, and should be remitted to the tribunals and councils of the church where it properly belongs, wherein it had its origin and should receive its final adjudication.
If the State tribunals have rightful jurisdiction and can interfere and determine any point in dispute between these suitors, the power and authority come from the provisions contained in recent laws enacted by the legislature in the years 1875, chapter 79, and 1876 chapter 176, both being supplementary to chapter 60 of the Laws of 1813, entitled 66 An act to provide for the incorporation of religious societies.55
Before considering the effects of these amendments, it is important to have in mind the interpretation placed upon 'the original act of 1813, as to the jurisdiction of the civil courts over religious corporations, as legal entities, and their trustees, as officers, when created by and under that act.
After much discussion, and in the face of conflicting opinions expressed by members of the highest courts in the State, a final judgment was reached, which is accepted as the true construction of the enactment; and among the propositions thus established are the following, to wit:
*368 That the members of the society or congregation form the corporate body, such members being the corporators, and the trustees are mere officers of the corporation. That the body or entity thus brought into existence is a civil corporation with such functions and powers as the statute confers upon it and its officers, and that in no sense is it an ecclesiastical corporation. That it is wholly independent in its existence, and in the control and management of its affairs, of all religious judicatories ; that it is a creature of the State and subject to such control as its own laws may impose; that none of the provisions of the act are intended to disturb, interfere with or regulate the actions and powers of the numerous voluntary religious organizations which exist among the-people ; but such bodies are recognized as existing, and are considered entirely spiritual associations distinct and separate from the body politic. Thus, in mere membership, the same persons may be the religious society, holding to peculiar religious notions, having their own creeds and forms of worship, and at the same time be members of the corporate body—the corporators with rights, privileges and interests which come from that relation. That was contemplated by the framers of the law, that individuals would hold this two-fold relation—although a person may be a corporator and not a member of the religious body.
It is also held by the courts, and it is an important determination as bearing on the question now to be decided, that the trustees, as officers of the corporation, have entire control over the property owned by the corporation, including the church or place of worship, and that courts of equity had no jurisdiction to interfere with the actions and doings of the trustees in the management of the property belonging to the corporation, for the reason that the legislature had expressly exempted religious corporations from the *369 jurisdiction which had been given to these courts over other corporations.
The several propositions thus stated are concurred in by the learned counsel on both sides of the present discussion and are found in the leading cases of Robertson v. Bullion, 11 N. Y. 243, and Petty v. Tooker, 21 N. Y. 267.
The plaintiffs now claim that recent legislation, the acts above referred to, confer on courts of equity the requisite jurisdiction to supervise and inquire into the actions and doings of trustees of religious corporations, in managing its temporalities, at the instance of any of the corporators, with the like power and effect, as it may concerning trustees, directors or managers of other civil corporations, and that trustees of religous corporations are now by virtue of the said acts under an express direction as to the way and manner they shall hold, use and apply the temporalities of the church, and are prohibited from, diverting the same to other uses and purposes.
These directions and restraints are all found in section 1 of act of 1876, which reads as follows, viz: “ The rectors, wardens, and vestrymen, or the trustees, consistory or session of any church, congregation or religious society, incorporated tinder any of the laws of this State, shall administer the temporalities thereof, and hold and apply the estate and the property belonging thereto, and the revenues of the same, for the benefit, of such corporation, according to the rules and usages of the church or denomination to which said corporation shall belong ; and it shall not be lawful to direct such estate, property or revenue to any purpose, except the support and maintenance of any church or religious or benevolent institution or object connected with the church or denomination to which such corporation belongs.” And also in section 1, of the act of 1870, which is as follows, viz :
*370 “The trustees of any church, congregation or religious society, incorporated under section 3 of the above entitled act, shall administer the temporalities thereof, and hold and apply the estate and property belonging thereto, and the revenues of the same, for the benefit of such corporation, according to the discipline, rules and usages of the denomination to which the church members of the corporation belong ; and it shall not be lawful for the trustees to divert such estate, property or revenues to any other purpose except toward the support and maintenance of any religious, benevolent or other institutions connected with such church, congregation qr religious society.”
These supplemental provisions to the general statute are radical in their character and effect, when read in the light of the construction which the courts have finally given to the original chapter. Doubtless they were enacted on the petition of citizens, who were members of the various religious societies existing in the State, who were pursuaded that a change in the law might be wisely made, so as to subject the trustees of religious corporations to the jurisdiction of the civil tribunals, as they were vested by law with the control and management of all property both real and personal, owned by such corporations. That the trusts conferred on the trustees were of such nature and importance that they ought not to be exempt from the oversight to which other corporate managers are subjected, and that the corporators themselves, should be deemed proper parties, who might complain of any departure from duty on the part of the trustees and invoke the protection of a court of equity, which from the nature of its powers, and the mode of exercising them, could give more complete and speedy relief than courts of law in matters of this nature.
It. will be seen that none of the new provisions *371 affect the nature of the title vested in the corporation ; the title to all the property remains vested and absolute in the corporate body. The provisions relate wholly to the officers of the corporation "; they are intended as statutory directions which point out the uses and purposes for whicht the temporalities and revenues of the corporation may be lawfully applied. When these officers intentionally or by a misconception of duty, are misusing the property under their care and control, diverting it from the purposes intended by the act of incorporation, they, on the complaint of any of the incorporators may be enjoined by the process and decree of a court having equity powers.
In applying the provisions of these statutes to cases as they may arise and come before the court, there can be no great misconception as to the intention of the legislature in using the language employed, to wit: “According to the discipline, rules and usages
of the denomination to which the church members of the corporation belong,” as found in the act of 3875. Or in these words : “For the benefit of such corporations according to the rules and usages of the church, or denomination to which said corporation shall belong ” as found in the act of 1876..
At the time of the passage of the general act of 1813, there existed in this state numerous denominations organized into voluntary associations, each distinct and separate from each other, differing in faith, doctrine, usage and discipline, all independent, being entirely free from state interference and control. This was the situation from the early settlement of the country. Hone of these religions bodies possessed any of the capacities, attributes and rights of a corporated body. In the law they had no legal existence. They were regarded as spiritual organizations, many of them embracing within their aims and purposes *372 other objects, such as supporting schools and colleges, and founding charities. As the country advanced in population and wealth, these societies increased in membership and their revenues multiplied. Religious and charitable men bestowed upon them large gifts. Thus the property devoted to these purposes became great in the aggregate, and to each separate society its estates and funds a matter of deep concern. Their management and preservation wqs a subject of great perplexity and constant anxiety, to the donor as well as to the members of the society, arising from the want of such powers and functions as are usually possessed by a corporation, by means of which the title to the property thus acquired could be held in succession and perpetuity, without corporate organization, the property and funds of these numerous bodies were liable to loss and waste, from causes and reasons which it is quite needless to enumerate in this connection.
This was the situation of the religious organizations in this State so far as their temporalities were concerned, when the act of 1813 was passed. By its provision these societies could easily and in pojnilar manner become incorporated, with the purpose of managing with more facility and advantage the temporalities belonging to the church or congregation. The extent and value of property which a single religious corporation can take and hold has been from time to time increased, so that now it is very great, and in the aggregate immense. The ability and inclination on the part of generous and religious minded people to bestow property on religious corporations is increasing if not equal to their capacity to take.
In view of the fact, that the different religious denominations are so numerous, and the powers of the trustees in the disposition of the revenues and property of the corporation are so great, and they not sub *373 jecfc to the jurisdiction of courts of equity on complaints of diversion of funds or on charge of the mismanagement of the temporalities of the church or society, the said acts were passed. As to the object and purpose of these new sections there can be no fair and reasonable doubt. After the formation of the corporation, the spiritual body remains, which is composed of the church members. ' The corpora tion entity deals with the temporalities of the society only. The trustees are its officers and agents. The new clauses relate to them wholly. The title to the property remains in the body corporate as before. It is made the duty of the trustees by the new provisions to use and manage the property and revenues of the corparation, according to the rules, usages and discipline of the church or denomination to which it belongs. That is, the spiritual body, the members thereof who organized and were instrumental in creating the corporation. The body corporate being created and brought into existence, to use its capacities, attributes and rights with which it is endowed bylaw, to facilitate the aims and purposes of the ecclesiastical body, which is composed of members who take an interest in the advancement of religion according to the faith and doctrine of the denomination to which they belong. The church or congregation to which the corporation does belong, is always a question of fact to be determined from the testimony which may be presented in a particular case.
The corporation defendant in which is vested the title, to the church edifice in which Mi*. Adams officiated as minister, and of which the other defendants are trustees, belongs within the sense and meaning of the new clauses to the Presbyterian Church or denomination, as that religious organization is shown to exist in this country, as a separate and distinct ecclesiastical body, with faith and doctrine, rules, usages and *374 discipline well understood and recognized by all its members.
Mr. Adams is a deposed minister of this denomination. The trustees of the corporation for the time being seek to maintain him as the minister over this society against the protests of the plaintiffs and others who are members of the congregation and of the spiritual body. This court is not called upon in disposing of this motion to investigate the charge made against- Mr. Adams, upon which he was tried and condemned by the Presbytery of which he was a member. He had due notice of the accusation ; was summoned before that judicatory. He appeared and answered the charge, and was fully heard in his defense. The proceedings were initiated and conducted in full compliance with the established rules and usages of that tribunal. His expulsion from the holy office of minister is not the subject of review or criticism in this action. . This court must accept the fact of his deposition, and determine the matter in controversy accordingly.
The ministerial office is made the first in dignity, importance and usefulness in the convictions of this body of Christians. By their faith, doctrine and ordinances only duly ordained ministers can of right administer the sacraments and perform other functions and duties which concern the spiritual welfare of those who are members of the church proper.
To continue Mr. Adams as minister over this church and congregation, who denies that he has been deprived of his holy orders, and persists in the exercise of all the holy and delicate duties of a minister of the gospel, as .that office is known to and believed in by Presbyterians, is to my mind a plain violation of the provisions of the new clauses, and is a use of the temporalities, the estate, the property of the corporation, contrary to the usages, forms, customs and *375 discipline of the church to which the corporation belongs. The trustees are the mere officers and agents of a civil and private corporation, having the care, control and management of its property. They must observe the directions which the political power of the State has given as to its use and enjoyment. If they depart from duty in this regard, or seek to divert the temporalities or revenues of the corporation, this court, acting as a court of equity, has jurisdiction under the new clauses to restrain them. According to the faith and doctrine of the members of this church, promulgated in its creeds and ordinances, Mr. Adams is now a mere lay member of its" communion. It requires but a slight observation of the religious convictions of men and women, to appreciate how persons of this communion would decline in view of the status now occupied by Mr. Adams, to receive him as their pastor and religious teacher, and would also regard the trustees as derelict of duty, in seeking to maintain him in that position. To such persons as are members of the corporation and the church whether they be the majority or the minority, the statute is designed to give protection.
It is argued by the learned counsel for the defendants that “ the church or denomination,” as mentioned in the late acts, point to the local church or society, and the members thereof, .and that it is the rules, customs, and discipline of this body that the trustees are to observe and follow in administering the trusts and duties conferred upon them. That their action is indorsed by a majority of the members of the local society, and therefore their conduct is justified, and the meaning and intention of the law observed. In instances where the local religious society, by the nature and character of its organization, is strictly independent of other ecclesiastical organizations, and so far as its church government is concerned, owes no fealty or *376 obligation to any higher authority, the argument is sound and obviously true, for the reason, no other body or society could be interested. Such an organization is independent, governed solely by itself. It can and may create its own form of government, and establish its own faith and doctrine, create its own customs and usages, and alter them at pleasure.
But to hold, in this case, that the local society is the “ church or denomination,” whose usages and discipline the defendants, as trustees, must observe, is to ignore an admitted and prominent fact.
In the Presbyterian form of government, the local congregation is but a member of the larger and more important religious organization, and is under its government and control, and is bound by its orders and . judgments in purely spiritual matters. There are in this system of church organization three judicatories, or representative bodies—the session, the presbytery, and general assembly. The purpose, powers and jurisdiction of each is distinctly stated and promulgated in the printed books containing its history, articles of faith and ordinances, which constitute the body of ecclesiastical law which governs this denomination. The church session represents, and is chosen by and from the local society, but it has no authority to create and issue rules of discipline, or establish usages and customs in religious matters; in this respect, it is wholly subordinate to the Presbytery, which body is vested with the functions : “to resolve questions of doctrine and discipline,” “ to ordain, install, remove and judge ministers,” and in general “ to order whatever pertains to the spiritual welfare of the churches under their care.” The jurisdiction possessed by the higher tribunals, the synod and general assembly, it is unnecessary to mention. It is therefore altogether certain that in so far as this particular denomination is concerned, that it is not the usages and customs of the *377 local congregation, or the session of the local church, that the trustees are under obligation to observe and carry out. It is not even pretended that the local church at Dunkirk has any usage or custom in the selection of its minister which is different from the customs of the larger church, as set forth in its books and rules of government, or that they have any exceptional views as to the qualifications and ordination of a minister of the gospel. The whole case is found in this statement, that the trustees seek to maintain in the pulpit of the church edifice, at Dunkirk, a deposed minister. This to my mind is a plain case were the trustees are using a portion of the temporalities of the corporation, contrary to the usages, customs and discipline of the Presbyterian church, to which this corporation is attached.
There is no claim put forth by any of the parties defendant that they or the local church of any of the members of the same have ceased to be Presbyterians, in faith or doctrine, or that the society has severed itself from the Presbytery to which it is attached, they do not deny its authority, but contend that in the deposition of Mr. Adams that body acted unwisely ■ and without just cause, with that question the court does not deal, as it is not within its jurisdiction and is not involved in this decision.
But over the defendants, as trustees of a civil and private corporation, the court has jurisdiction and power to restrain them by injunction from violating the directions of the statute, as to the use and management of the property and estate in their hands, belonging to the corporation. The plaintiffs, as corporators, with a view to protect their property interests,
' growing out of the relation which they hold thereto, are the only necessary parties, to initiate this suit and prosecute it, to a final judgment.
It is now well settled law that one alone of many *378 incorporators, can file a bill in his own name, and on behalf of all others of the corporators, who feel aggrieved to prevent and restrain the officers and agents of a civil and private incorporated body, from diverting and misusing the property, funds and revenues belonging to the corporation.
The motion to dissolve the injunction is denied, without costs.