# CHARLESTON.

SANDERS v. MEREDITH *et als.*

Submitted April 4, 1916.    Decided June 1, 1916.

1. RELIGIOUS SOCIETIES—*Trust—Construction.*

A recital in a deed made to trustees of church property, that it was purchased "to erect a parsonage upon for the use of the minister traveling the said Monongalia Circuit of the M. E. Church," does not create a trust forbidding the use of a part of the lot for the erection of a church building thereon.   (p. 567).

2. SAME—*Church Government—Conference.*

The quarterly conference of a circuit of the Methodist Episcopal Church, West Virginia Annual Conference, composed of a number of church societies, or ministerial appointments, is vested by the law of the Church, with the management and control of church property within its territorial limits.   (p. 568).

78 W. Va

3. SAME.

    Such quarterly conference has the power to permit a portion of a lot, previously purchased as a parsonage for the use of the minister serving such circuit, to be taken for the erection of a church building for the use of a local society of such Church, without thereby violating any property rights of other members of the Church, residing within the circuit, whether they contributed to the parsonage fund or not.  (p. 568).

4. SAME—*Government—State Law.*

    The action of the quarterly conference in such matter contravenes no state law and is not subject to review by the state courts.  (p. 568).

    (LYNCH, JUDGE, dissenting).

    (MASON, JUDGE, absent).

Appeal from Circuit Court, Monongalia County.

Suit by James Sanders against Clinton B. Meredith, pastor, and others.  From a decree for plaintiff, defendants appeal.

                    *Reversed and bill dismissed.*

*Glasscock & Glasscock,* for appellants.

*Lazzelle & Stewart,* for appellee.

WILLIAMS, PRESIDENT:

The local society of the Methodist Episcopal Church in the town of Westover, Monongalia county, desiring to erect a church building, and claiming to have permission from the Quarterly Conference of Monongalia Circuit, the body of said Church alleged to have jurisdiction and control of all church property within the bounds of said circuit, and from the trustees of the property here involved, to build the same on a lot situated in the town of Westover, which had been previously conveyed to trustees of said Church as a parsonage, Clinton B. Meredith, the minister then serving said circuit, and Nathan E. Shaffer, one of the trustees of the new building to be erected, entered upon said parsonage lot and began plowing and scraping the ground to level it and make it ready for the building to be erected thereon.  Whereupon, plaintiff, a member of one of the local societies of said Church, at Bethel, within said Monongalia circuit, and a trustee of the afore-

said parsonage property, suing on behalf of himself and other members of the Church within said circuit, filed his bill in the circuit court of Monongalia county against Clinton B. Meredith, pastor of said circuit, John Shriver and four others, trustees of said Church in Westover, praying that they be enjoined from plowing, scraping and removing the earth, trees, shrubbery and fences on said lot, and from otherwise trespassing thereon.

On the 17th of October, 1914, in vacation, the judge awarded a temporary injunction as prayed for. Defendants demurred to the bill and filed their joint and several answer, and, after due notice to plaintiff, moved to dissolve the injunction. The motion was heard in term on the 10th of December, 1914, upon the aforesaid pleadings and exhibits therewith, general replication to the answer, and numerous affidavits taken and filed by both plaintiff and defendants, and the final decree entered from which defendants have appealed, overruling both the demurrer and the motion to dissolve the injunction and making it perpetual.

The parsonage lot is rectangular in form, fronting 115-½ feet on Holland Avenue, and extending back 188 feet between Morrison Avenue and East Street, parallel streets, and contains one-half acre. The parsonage stands near the intersection of Holland Avenue and East Street; and the site for the proposed church building is at the other end, and on the diagonal corner of the lot from the parsonage, and fronts on Morrison Avenue. The amount of ground needed for the church building is sixty feet front on Morrison Avenue, and extends back one-half the depth of the rear end of the lot, or 57.75 feet.

It clearly appears by the weight of testimony that the remainder of the lot will furnish ample ground for the purpose for which the whole of it was originally conveyed, that is, for a parsonage, and also that permission had been obtained from the Quarterly Conference of said Monongalia circuit, and from the trustees of the parsonage property, to use 60x57.75 feet on one corner of said lot for a church building for the local society at Westover. Trustees for the new church and also a building committee were regularly appointed by the

Quarterly Conference, as required by the Discipline of said Church. It also appears that at least one hundred members of the Church, within said circuit, have signed a petition opposing the building of a church on the parsonage lot.

The deed for the property was made December 27, 1889, to three persons named and denominated an executive committee, and states that it was purchased "to erect a parsonage upon for the use of the minister traveling the said Monongalia Circuit of the M. E. Church." Trustees of the parsonage property were later appointed in the manner provided by Sec. 4, Ch. 57, Code 1913, and the lot was conveyed to them by the executive committee for the same use.

Counsel for plaintiff contend that the property is held in trust as a parsonage for the whole circuit, consisting of many local societies, and that it is a violation of the trust to surrender a part of the lot for a church building for the use of a local society of the same Church, in the manner here attempted.

On the other hand, counsel for defendants insist that such is not a material diversion of the use; that whether the lot is used wholly for a parsonage, or partly for a parsonage and partly for a church building, it is, nevertheless, church property, and would still be used for church purposes; and that, according to the Discipline and rules of the Church, the Quarterly Conference of Monongalia circuit had the right and the power to authorize such use of a part of the lot. They further insist that, in ecclesiastical matters, the courts will respect the rulings of the constituted church authorities, when not inconsistent with state law.

Although the Keck deed recites that the lot was purchased "to erect a parsonage upon," that language does not create a trust or condition subsequent forbidding its use for any other purpose. It is a mere expression of intention to use it for a parsonage, and not a condition affecting the estate conveyed; the Church was not bound to use it for that purpose. *Downen* v. *Rayburn*, 214 Ill. 342; 3 Am. & Eng. Ann. Cases 36, and numerous cases cited in note at pages 38 and 39; *Board of Supervisors* v. *Patterson*, 56 Ill. 111; *Keatley* v. *County Court*, 70 W. Va. 276; *Hardy* v. *Wiley*, 87 Va. 125;

and *Stansbury* v. *First M. E. Church,* (Ore.) 154 Pac. 887. The conveyance is of the fee, and the deed does not provide that the lot shall be used for a parsonage, and for no other purpose; or that it shall revert to the grantor or his heirs if it should cease to be used as a parsonage. Some such unequivocal expression is essential to the creation of a condition subsequent. *Brown* v. *Caldwell,* 23 W. Va. 187; *Rawson* v. *Uxbridge,* 7 Allen 125. Conditions subsequent are not favored by the law, and the language of a deed or other writing will not be construed to create a conditional estate, if it will admit of any other reasonable interpretation. *Lowman* v. *Crawford,* 99 Va. 688; and *Alexandria &c. R. R. Co.* v. *Chew,* 27 Grat. 547. Although the legal title to the lot is held by trustees, the deed under which they hold does not prescribe any particular use to be made of it. The trustees hold it for the benefit of an unincorporated religious society, the Methodist Episcopal Church, and the uses that can be made of it depend upon the ecclesiastical law of the Church, so far as it is not inconsistent with the law of the land. The law of the state limits churches in the quantity of real estate they may acquire and hold, and prescribes the method whereby they may dispose of it. But it does not limit them in the uses they may make of their property, so long as such uses are consistent with the purpose and plan of their organization; neither are they restricted in their right to dispose of their property and make such uses of the proceeds as they may deem proper. The statute simply provides the manner of selling church property. Sec. 9 of Ch. 57, Code, provides that no such sale shall be made unless it appear to the court that a majority of the members of the church desires the same. But it contains this further provision: "but in any case where the authority to administer the affairs of such church, religious sect, society, congregation or denomination, is, by its rules and ecclesiastical policy, committed to a delegated or select body, such sale may be when it appears that such delegated or select body desires the same." Sec. 4 of the same chapter authorizes the removal of trustees of church property, and the appointment of others in their stead, upon the application of the Quarterly Conference whenever such action may be nec-

essary to secure the use of the property to those justly entitled to it; and the party justly entitled, in this case, is the Quarterly Conference, the governing body of the Church. Thus does the statute law clearly recognize the right of control over church property by their governing bodies.

The Discipline of the Methodist Episcopal Church, which is its ecclesiastical law, delegates to the Quarterly Conference the power to control and dispose of church property within its territorial jurisdiction. Secs. 351 and 352, Discipline 1912. And Sec. 353 further provides: ''Houses of worship and Parsonages may be removed from one place to another on the same conditions as those on which they may be sold.''

Although Sec. 9, Ch. 57, Code, requires proceedings to be instituted in the circuit court, by the board of trustees holding the legal title to the church property, for the sale thereof, they must first be authorized to do so by the Quarterly Conference. That body controls their action; and the statute above referred to recognizes its right of control. It is also an implied recognition by the legislature of the rule, frequently announced by the courts of this country, that they will not review and revise, but will respect the actions of ecclesiastical bodies in matters purely of ecclesiastical concern. *State ex rel. Watson* v. *Garvin,* 54 Mo. 353; *Den.* v. *Bolton,* 12 N. J. L. 236; *White Lick Quar. Meet. of Friends* v. *White Lick Quar. Meet. of Friends,* 89 Ind. 136; and 34 Cyc. 1170.

The Quarterly Conference doubtless considered that the interest of the entire Church in Monongalia circuit would be promoted by the erection of a church on the parsonage lot for the use of one of its local societies at Westover. It was the proper tribunal to determine that question, according to the church discipline. It had the power to make such use of a part of its ground, and its judgment, in that respect, is not reviewable by the civil courts. Whether plaintiff was a contributor to the parsonage fund or not, he has no such individual property right as entitles him to complain of the action of the Quarterly Conference. When he became a member of the Church, he did so upon the condition of submission to its ecclesiastical polity and jurisdiction; and, however much he may be dissatisfied with the action of its governing body, he has

no right of complaint which the state courts can recognize, no individual property right being involved.

The decree will be reversed and plaintiff's bill dismissed.

*Reversed and bill dismissed.*

LYNCH, JUDGE, *(dissenting):*

To justify the action of the quarterly conference, defendants rely on, and the opinion of the majority cites, paragraphs 351 and 352 of the Discipline. What relevancy they have to the issues involved does not seem apparent. Their obvious purpose is to confer authority on the quarterly conference, when necessary, to prevent or to approve a movement on the part of the trustees to sell the property the title to which is vested in them for the benefit of the circuit or of a charge or society located within the circuit. While the trustees can not obtain permission of the circuit court to sell such property without the consent of the quarterly conference, that body can not compel the trustees to apply to the court for leave to dispose of the property by sale thereof. It can not take the initiative. Nor can it control the disposition of the proceeds derived from such sale. The court, not the ecclesiastical body, "shall make such disposition of the proceeds thereof as may be right and proper and not inconsistent with the purposes for which the trust was created". §9, ch. 57, Code. Nor will the judicial tribunal grant permission to sell except upon notice duly published and posted as required by that section, so as to advise all persons interested of the pendency of the proceeding; nor then unless it appears that the rights of others will not thereby be violated. Besides, the trustees may, without the consent of the quarterly conference, indeed over its protest and objection, borrow money "if required for building or other legitimate purposes in the execution of such trust, and may execute a lien upon any property held by them as such trustees to secure the payment thereof". §8, ch. 57, Code. And, except as otherwise provided, section 7 of the same chapter gives to the local society or congregation the control of property conveyed to trustees either as a place of public worship or as a residence for a minister. Not only does the statute authorize the trustees of a church to encum-

ber the property held by them for the purposes mentioned; but paragraph 341 of the Discipline impliedly grants the same right, because it is therein provided that ''in no case shall the trustees of church or parsonage property mortgage or encumber the real estate for the current expenses of the church''. Besides, to indicate a purpose to secure individuality of action and removal from the exclusiveness of control by the quarterly conference, paragraph 337 provides for the election of trustees by members of each particular society. Instead of showing the absoluteness of the dominion conceded by the opinion to the quarterly conference, the obvious purpose of the paragraphs and the provisions of the Code is to restrict or limit the power of the conference to the exercise of the right of mere supervision. It may consent or withhold its assent. It can preserve the status of the property. It can require the trustees to make repairs. But it is powerless to change or alter, or permit any changes or alterations in the title or possession thereof, except upon the initiative of the trustees.

It is equally obvious that the court will protect the rights of all persons, whoever they may be or whatever interest they may have or possess in respect of the property before it. On what legal principle rests the extraordinary power conferred by the opinion prepared in this case? No authority is cited to sustain what I conceive to be a manifest usurpation of power by the quarterly conference. Traced to its ultimate consequences, the opinion empowers that body, if it so determine, arbitrarily to deprive the circuit of the use and enjoyment of the entire parsonage property and devote its exclusive use to the Westover society or charge, without requiring that charge to render any compensation therefor to the real owners of the property. The diversion and appropriation of the whole would be as consistent (except in degree) as the diversion and appropriation of a part of the lot. The only difference in the results is that one is partial, the other total. But there is just as much reason and authority to sustain the one course as there is to sustain the other. They are equally arbitrary, and equally violative of the rights of the real owners and of those who contributed of their means to

purchase the property for the particular purpose to which it has been devoted.

Or reverse the situation presented, and test it by the principles enunciated in the opinion. If the quarterly conference, possessed of the dominion and power thus accorded to it, should determine to deprive one of the charges within the circuit of the whole or a part of a lot it had purchased and thereon erected a house devoted to public worship covering either the whole or part of the lot, and to devote such lot or the building thereon for the use and purposes of a parsonage, without requiring payment of any consideration therefor, will any court permit the exercise of such destructive power if applied to for relief by restraint? Can it reasonably be said there is no legal remedy available to prevent the accomplishment of any such indefensible course of procedure? For every wrong there is supposed to be a remedy somewhere. Where, then, may it be found? The opinion furnishes no answer, unless it may be inferred that the remedy reposes in the autocracy said to inhere in the controlling conference. But its action has virtually closed the door of hope for redress for the wrongs it has perpetrated or to which it has readily yielded its consent, and now insists on the justness of its decision. If there is a higher ecclesiastical judicatory to which an appeal may be had, none is pointed out; and a diligent search reveals none in the ecclesiastical code—the Discipline in this instance.

In the absence of such a provision for an appeal, and a wrong has been committed, equity will discover, and when discovered apply, a remedy. That is what the Texas and Michigan courts did in *Clark* v. *Brown,* 108 S. W. 421, and *Fuchs* v. *Meisel,* 102 Mich. 357. The facts of these cases, it is true, differ in some respects from those appearing in the record of this case; but they involved property rights, just as property rights are involved here, as I understand them. In the Clark case, it was held in substance that where the grantor of property indicated a purpose to establish and thereby to promulgate a particular religious creed or faith, which he made a condition of the grant and the real consideration therefor, the courts will upon the application of the proper

parties interfere to prevent a diversion of the property grant-
ed from such purpose and its devotion to a distinctly different
purpose. And, in construing a statute providing that "neith-
er the canon law nor the decree or order of any ecclesiastical
council or body, nor any custom or usage founded thereon,
nor any custom or usage of any church, congregation or re-
ligious society or religious order shall hereafter be recognized
or enforced in this state so far as such law, usage or custom
shall relate to the acquisition, tenure or control or disposition
of any real estate or any interest therein, or any use or trust
connected or to be connected therewith, it was held in *Fuchs*
v. *Meisel, supra,* that that act, of which we have no counter-
part, "has never been construed so as to deprive those entitled
to property rights, under the conclusive ecclesiastical order
and decree, of a remedy which they otherwise have not". So
in *Chase* v. *Cheney,* 58 Ill. 509, it was held that the constitu-
tional guaranty of "the free exercise and enjoyment of re-
ligious profession and worship without discrimination" for-
bids judicial interference except where civil or property
rights are involved. Likewise, when a society in character re-
ligious holds property in common, without industrial interest
in any member, as most church properties are held, equity
will interfere and preserve the *status quo* of such property
in the absence of any other adequate available remedy. *So-
ciety of Shakers* v. *Wilson,* 68 Fed. 730. The courts have jur-
isdiction to determine controverted claims for the use of
church property. *Gartin* v. *Pennick,* 68 Ky. 110; *Bates* v.
*Houston,* 66 Ga. 198.

The opinion in the case before us does not venture to assert,
and rightfully could not assert, as I believe in view of the
cases cited above, that appellants do not have any property
rights in the parsonage lot of which they will be deprived if
such property is to be devoted to a use different from that
expressed in the grant, unless it is sold under an order of the
circuit court upon the application of the trustees and with the
assent of the quarterly conference and the rights of the ap-
pellants conserved, as doubtless they would be, by the circuit
court of Monongalia county. All members of a religious so-
ciety, though not incorporated, are equal beneficial owners

of church properties, whether they contributed the same or different or any amounts for the purchase or improvement thereof; and any one or more of them may, on behalf of themselves and others, resort to an equitable forum for the redress of wrongs done to their property or property rights. *Ferraria* v. *Visconcellos,* 31 Ill. 25.

Where the title is vested in trustees for a particular use by a religious society, the courts will enforce the trust and hold the property to the designated uses, but will not lend its aid to divert it from such uses. *Nelson* v. *Benson,* 69 Ill. 27. Nor will equity permit the trustees of church property to lease any part of it to a teacher of a private day school, with leave to change the internal arrangement of the rooms of the building so as to suit his convenience, and will enjoin such use on the application of the individual members of the society. *Perry* v. *McEwen,* 24 Ind. 440. To determine the rights of contending factions of a religious society to the use of church property, injunction will lie at the instance of the faction entitled to the property to restrain trespass by the other. *Fulbright* v. *Higginbotham,* 133 Mo. 668. Like jurisdiction exists to prevent the appropriation of church property to a religious use different from that intended by the donor. *Suter* v. *Spangler,* 4 Phila. 331.

These decisions, and others of a similar character, make obvious the right of one or more members of such a society to maintain a suit on their own behalf, for the benefit of all others who feel aggrieved, to enjoin a diversion of the property by the trustees, who with us have the immediate personal control of the church temporalities. *Isham* v. *Fullager,* 14 Abb. N. C. 363; *Nash* v. *Sutton,* 117 N. C. 231; *Niswell* v. *First Congregational Church,* 14 Oh. St. 31; *Mannix* v. *Purcell,* 46 Oh. St. 102; *Beatty* v. *Kurtz,* 27 U. S. 566; *Berryman* v. *Reese,* 50 Ky. 287.

In the revised opinion, reliance for reversal is placed upon a paragraph of section 9, chapter 57, Code. This provision has not the least relevancy to the matter in issue in this cause; and it has never been resorted to in any application to a circuit court of this state for the sale of property belonging to any Methodist society or congregation of that denomination.

Such proceedings have always been instituted upon the application of the trustees. Their authority has generally been recognized and none other. They must of course have the assent of the quarterly conference; but that assent alone does not suffice, as will readily appear from the requirements of the Code. Else why the necessity for a publication of a notice of the proceeding to sell? It must be made to appear plainly that the congregation, society or body whose property is to be sold also consents. I am speaking now only of the property of the Methodist Episcopal denomination. The effect of the opinion is to bestow an unwarranted and arbitrary authority on the quarterly conference, and that too, as I think, where none exists under the Discipline or the Code. Under such authority, that body may, if it be so disposed, convert valuable property from one use to another in flagrant violation of the rights of others, with impunity and without redress. It may sell or give away the most costly church in the state, and devote the proceeds to such other religious use as to it alone may seem proper, and none will be heard to complain. That it will perhaps not undertake so radical action does not furnish an answer. What it can do it may do.

As these authorities cited warrant an affirmance rather than a reversal of the decree of the circuit court, and as the proposed use of the property involved is in effect a diversion and misappropriation, I can not concur in the opinion of the majority, notwithstanding they seem to think the authority of the quarterly conference supreme and that the proposed appropriation of part of the property is beneficial to the circuit. How any benefit accrues to the real owner is not made clear. The correctness of the proposition that the interests of an owner are enhanced when he is deprived of the use of his property, without the payment of any consideration, I fail to comprehend.