PET. EQ.

Case 14.

Harper *vs.* Straws.

### ERROR TO LOUISVILEE CHANCERY COURT.

1. When property is conveyed to a particular church without reference to its connection with any other society or body, the majority of the church are the beneficiaries who remain under the organization then existing.

2. When property is conveyed to a particular church as such, and it be sold for its debts, the surplus is held by the trustees as the original was held—for the benefit of the church, and not subject to any conditions not attached to the first.

3. A church, under organization, possessing and holding property as a church, cannot be divested of the property by a part, even a majority of its members re-organizing themselves into another organization, even by the same name, provided the old organization still exist as an organization.

4. By the reorganization, the persons constituting it in effect by such revolutionary movement and secession, threw themselves out of the church organiaation, and forfeited all claim to any interest in the property held by the church, or identity with it.

5. Where a trustee shows by his conduct a disposition to violate his trust duties, the chancellor having power over the subject, should remove him and appoint another.

6. An African church holding property as such, independent of any dependence upon any other church organization, cannot, by the chancellor, be subjected to any control or supervision of any such organization to which it is not subjected by the deeds through which the property is held.

June 23.     Judge MARSHALL delivered the opinion of the court.

Case stated.

This case presents a contest between two congregations, or two portions of a divided congregation of African Methodists, in the city of Louisville, each claiming the church property.

It appears, that about the year 1845, the lot and meeting-house thereon, which had been erected by the Methodist Protestant Church, in Louisville, at the corner of 4th and Green streets, was sold under a decree for the payment of the debts of the society to which it belonged; that Harper was reported as purchaser, for the benefit of the African Society of Methodists, called "Asberry Chapel;" that the sale produced a surplus after payment of the debts provided for, and that as the Methodist Protestant Church to which the property had belonged, was dissolved, and had cased to exist; the chancellor, by the desire,

or with the consent of the original donors of the charity, gave the benefit of this surplus to the worshippers at Asberry Chapel, and in 1847, a deed was executed conveying the property which had been purchased by Harper, to David Straws and four others, among whom was Harper, "to be held by them and their successors, in trust, for the use and benefit of the religious Methodist Society of the African race, now worshipping, or which may hereafter worship in said church, now called Asberry Chapel."

In the meantime, the society of African Methodists, called 'Asberry Chapel,' had worshipped at the house at the corner of 4th and Green streets, and were, as reported to the court, by its commissioner, a regularly organized body, with three hundred and forty-four members, under the superintendance of the Methodist Episcopal Church, south, under the charge of William Holeman, the stationed minister, at 8th street church in Louisville; and the said Harper was their pastor of the African race. While the society continued to worship at the corner of 4th and Green streets, and under the pastorship of Harper, he was expelled from the Methodist Episcopal Church, south, and his congregation supposing that his expulsion was occasioned by his unwillingness, that their church property should be given up to the Methodist Episcopal Church, south, according to the discipline of that church, adhered to him, and continued for some time, to worship under his pastorship, without connection with any other organization. In a short time, however, he and they, at his instigation, were received into connection with a body called the African Methodist Episcopal Church of the U. S., which had its principal organization in the free states.

Under the authority of this church, Harper was removed from the society worshipping at Asberry Chapel, in Louisville, and sent as a preacher to New Orleans, and H. S. Revel was appointed as pastor to the society in Louisville. After remaining sometime in New Orleans, Harper returned to Louisville,

and being expelled from the African Methodist Epis-
copal Church of the U. S., for insubordination, in-
duced a number of persons who were, or had been
members of the society of Asberry Chapel, to unite
with him in forming an independent Methodist
Church, which was done in July 1851. Before this,
the society of Asberry Chapel had sold their property
at the corner of 4th and Green streets, to the Masons,
who undertook to furnish a lot and build a house in
another place in the city, to the value of the price
agreed on. The house at the corner of 4th and
Green streets was given up before the other was
completed, and the two congregations, one under
Revel, and the other under Harper, worshipped at
such places as they could procure.

In October, 1851, the house to be furnished by the
Masons being near its completion, Harper, for him-
self and the congregation worshipping with him,
filed this bill against Straws and others of the con-
gregation worshipping with Revel, claiming that the
former constituted a majority of the members of As-
berry Chapel, and of the society worshipping at the
corner of 4th and Green streets, at the time when
they erected themselves into a separate church, and
that they were, and are, the religious society of the
African race, and the society worshipping at Asberry
Chapel, for whose use and benefit the property was
conveyed, under the decree of the chancellor, and
that they are entitled to the exclusive right and use
in the property and building to be furnished by the Ma-
sons, and they pray accordingly. The defendants de-
ny this claim, and all the material allegations made
in support of it. They deny that the persons who
with Harper, set up an independent church, were the
majority of the original society, or were generally,
members of it at the time, allege that they had for
the most part, been expelled from said society, or had
withdrawn or been dropped, and maintain in sub-
stance, that they constitute not the original body or
society, but a new and distinct one, having none of

HARPER
vs.
STRAWS.

the rights of the former, and that they, the defendants, having preserved the same organization, the same officers, and the same church books which had belonged to the original society, must be regarded as the only regular and legitimate continuation of it, and as constituting alone the society which had formerly worshipped at Asberry Chapel, and to whose use and benefit the property at the corner of 4th and Green streets was conveyed. They therefore pray that the property to be furnished by the Masons may be conveyed to trustees for their use and benefit, and that they may have the possession, &c.

Many matters are brought into the case by the pleadings and evidence, which, without throwing any light upon the real issue, show a state of bitter feeling on both sides, which they are calculated to exasperate. The true question is, which of these congregations is the society which worshipped at Asberry Chapel, that is, in the house at the corner of 4th and Green streets, at and after the date of the deed conveying the property to that society. It is a question of identity, not of individuals, but of the body. And as the deed makes no reference to the connection of the beneficiaries, with any other church organization as essential to their rights, the continuance of the connection which existed at its date, cannot be regarded as entering into the question of identity, by which it is to be determined who are the beneficiaries. That question is to be determined by reference to the acts and internal organization of the body itself. Its external relations can, at most, constitute auxiliary considerations only for determining the question of identity as between the parties claiming that identity.

1. When property is conveyed to a particular church without reference to its connection with any other society or body, the majority of the church are the beneficiaries who remain under the organization then existing.

Thus, when upon the expulsion of Harper from the Methodist Episcopal Church, south, the whole body of his congregation adhered to him as their pastor, and thus, in effect, repudiated their connection with that general organization, and when they afterwards, with him, became a part of the African Methodist Episcopal Church of the U. S., they con-

HARPER
vs.
STRAWS.

tinued, notwithstanding these changes in their external relations, to be the identical society for whose use the deed conveyed the property, and were still entitled to the use, because these external relations constituted no part of the description of the beneficiaries, and not being referred to at all in the deed, they cannot be regarded as entering into the motive or consideration on which it was made.

If, in securing the gratuity of fifteen hundred dollars, or in virtue of that gift made under the sanction of the chancellor, he had power in effectuating the purchase of Harper at the decretal sale, to impose conditions on the title or the use, which were not implied in the terms of the decree, and the sale made under it, which we do not affirm, such power could only have been exercised by imposing the conditions in the conveyance, or at least in a decree prescribing its terms or the terms on which the property should be held or its use enjoyed. No condition of a continued connection of the beneficiaries with the Methodist Episcopal Church, South, having been thus imposed, the power to impose it ceased with the power of the Chancellor over the conveyance of title to the purchaser under his decree, and thus being extinct, it could not afterwards be exercised but by consent of the beneficiaries, and certainly it is not resusitated by this contest in which he is called upon to decide, which of these parties is entitled, under the deed, and has no further power but that of effectuating his decision of that question. It follows from these remarks, and may be here stated, that the decree is erroneous in imposing upon the use of the property by the defendents who were decided to be entitled to it, the condition, that the Methodist Episcopal Church, South, should have the superintendence of the society, should appoint the pastor, administer ordinances, &c. Each party assigns this feature of the decree for error. But as it is only prejudicial to the party entitled to the property, it cannot be a ground of reversal except for that party. The true society of Asberry Chapel is entitled to

2. Where property is conveyed to a particular church as such, and it be sold for its debts, the surplus is held by the trustees as the original was held—for the benefit of the church, and not subject to any conditions not attached to the first.

the use of the property now to be conveyed, upon the same terms on which it had the use of the property originally conveyed. Each of the present parties claiming to be that society, claims the property as a purchaser who has paid for it, and is entitled to a conveyance according to his contract. If the chancellor were making a donation, he might, of course, impose conditions or restrictions according to his discretion; but if a trust for the use of a religious society of the African race be not unlawful, of which there is no intimation, then this contest presents simply a question of property, that is, of pre-existing rights, and considerations of expediency or policy growing out of the institution of slavery, and the proper relations of whites and blacks in the community, can no more authorize the imposing of conditions or restrictions upon the right when determined, than they can properly influence the determination itself. Such considerations may operate where there is room for discretion or construction, but not in the judicial determination of a question of private property.

In point of fact, neither of the contesting parties was, at the commencement of this suit, in connection with the Methodist Episcopal Church, south. The party complainants were independent. The others were a part of the African Methodist Episcopal Church of the U. S., which fact was urged to their disadvantage by Harper, who had led the entire society into that connection. The defendants, on their part, showed that Harper had acted with great impropriety towards the ministers and officers of the Methodist Episcopal Church, south, while that church claimed the superintendence of the original society. If the grounds of the decision in favor of the defendants are to be looked for in the reasoning which precedes it, it might seem to have been based mainly upon the conduct of Harper, the head of the complaining party, and upon considerations of expediency and policy, without a distinct settlement of the

question of identity, or of numbers, as insisted on by the parties respectively. And there was no reference to a master who might have ascertained important facts bearing upon these questions, which are now either not noticed in the record, or rest upon vague and general statements of witnesses.

With respect to the whole number of the actual members of the original society of Asberry Chapel, which had worshipped at the corner of 4th and Green streets, as said society existed when Harper and his followers raised up an independent church, there is some obscurity and uncertainty in the record, and consequently the respective numbers of the actual members who followed Harper, and of those remaining with Revel, is not satisfactorily ascertained; there is no exhibition of the books of the church, or of extracts therefrom, and no report of a master; the allegations of the parties, and the testimony of witnesses on the opposite sides, are contradictory with respect to numbers, expulsions, and withdrawals. But, although, from these causes the precise state of fact in the particulars mentioned, remains so uncertain, that if the question of property depended upon determining on which side the majority was, we might deem it necessary to remand the cause for the better ascertainment of that fact; we are of opinion, that according to the weight of the testimony, so many of those who united with Harper in erecting the independent new church, had previously been expelled or withdrawn from the society, that a majority of the actual members at the time, remained with Revel. We do not, however, regard this as the decisive test of the rights of the parties. Conceding it to be uncertain whether a majority of the actual members of Asberry Chapel joined in erecting the independent organization, or remained as they were, or even conceding that some indefinite majority may have gone with Harper, the fact established by the evidence, and in truth, rather avowed than denied, by Harper and his party, that they established a new organization, im-

piying, of course, that such of them as belonged to
the old organization, then left it, while the other par-
ty remained an organized body, such as it was be-
fore, except in numbers, with the same officers, the
same books, the same organization, and all the *in-
decia* of identity as a body, and with numbers, wheth-
er equal to those of the other party or not, manifestly
sufficient to maintain themselves as a religious soci-
ety or congregation, seems to be decisive of the ques-
tion of identity, and other question of property as
dependent upon it.

The complainant Harper files as an exhibit with
his bill, the resolutions, by the adoption and signing
of which, the body represented by him, was constitu-
ted.  In those resolutions, after professing to give a
history of Asberry Chapel, or as they call it, the "old
Asberry Chapel," they say, "these things, and many
more that might be named, have caused the members
of the Asberry Church to lose confidence in the Afri-
can Methodist Episcopal Church, and we feel our-
selves driven to reorganize in our old organization,
binding ourselves as heretofore, to be subject to the
laws and rules of the city of Louisville; and we do,
on this 30th day of July, 1851, reorganize the Asberry
Chapel, and we unanimously call the Rev. James
Harper to be our pastor, &c.   When this proceeding
took place, the old Asberry Chapel, considered as the
place of worship, referred to in the deed by which it
was conveyed, had ceased to be a place of worship.
But the society which had worshipped there until it
was taken by the Masons, continued to exist as an
organized society of christians, forming a congrega-
tion with the same officers, the same pastor, and the
same records.   The party which felt itself driven to
reorganize in the old organization, had never before
been an organized body or society of christians, and
notwithstanding the assumption of the old name, and
the mystery of "reorganizing in the old organization,"
it cannot be, that while that old organization remain-
ed complete and distinct, and competent to the per-

3. A church
under organi-
zation possess-
ing and holding
property as a
church, cannot
be divested of
their property
by a part, even
a majority of
its members re-
organizing
themselves into
another organ-
ization, even by
the same name,
provided the
old organiza-
tion still exist
as an organiza-
tion.

4. By the reorganization, the persons constituting it in effect by such revolutionary movement and secession, threw themselves out of the church organization, and forfeited all claim to any interest in the property held by the church or identity with it.

formance of its proper functions, and to the enjoyment of its rights, it could be merged in, or superceded by this new organization. The movement indicated by these resolutions was revolutionary. Those who participated in it, if they had, up to that time, been members of the society which had worshipped at Asberry Chapel, acted in this measure of reorganization, independently of that society, threw off its authority, and renounced their connection with it. They formed in fact, a new society, which, whatever name, form, or rights it might assume or claim, had never, as a society, worshipped at Asberry Chapel. By this willful and violent secession, the seceders lost their identity with the society from which they seceded, and forfeited the rights dependent upon that identity. As members of the society which had worshipped at Asberry Chapel, they had been entitled to the benefit of the deed securing the use to that society. By their secession, they ceased to be members of it, and being therefore, no longer within the description of the grantees or beneficiaries of the deed, they cease to have any interest in the title or the use. Being members of a new and different society, though they may still be Methodists of the African race, they are not members of a society which had ever worshipped at the Asberry Chapel referred to in the deed; and their assumption of the name can give them no rights whatever to the property as against those who continue to be members of the original society which did worship at that place. It is as members of that society only, that individuals have an interest in the property. As long as the religious Methodist Society of the African race, which worshipped at the church, called in the deed, Asberry Chapel, retains its identity, that society and its members, at whatever time they may become so, must be regarded as the sole beneficiaries of the property conveyed by that deed, and of any other which the society may purchase with it, except so far as the society itself may change the uses to which it is devoted. The chancellor, therefore, did

not err in deciding that the defendants being the society of Asberry Chapel, which had remained under the pastoral care of H. S. Revel, were entitled to be the beneficiaries of the deed by which the new property, furnished by the Masons, should be conveyed.

But we are of opinion, that it was improvident to have named the complainant Harper as one of the trustees to hold the property for the defendants. His turbulent ambition is manifested throughout the case; and if it be not regarded as an error, to have appointed him in the first instance, we are of opinion, that upon their subsequent petition, with the proof of his claims and pretensions in opposition to the decree, and founded upon the fact of his being a trustee, and first named in the decree, he should have been removed, and another named in his place. We are also of opinion, that the defendants are entitled to full and exclusive use and possession of the property, so soon as they shall satisfy the chancellor that they have paid to Harper, and his associates, such sum or sums of money as he or they may, under the sanction of the court, have advanced towards the completion of the building, and putting in order the premises now in dispute.

The decree properly excludes the Methodist Episcopal Church, south, from all interest in this property, and from all control over it. The discipline of that church, and also of the African Methodist Episcopal Church, provides for securing such interest and control to the general, instead of the local or particular churches, as a thing desirable, and to be obtained, if practicable. It was this policy of these general churches, which seems to have given rise whether with, or without sufficient cause, to that jealousy and sensitiveness on the part of the society of Asberry Chapel, which enabled Harper, by alarming their fears for the safety of their property, and by manifesting an extraordinary zeal for its preservation, to draw, at first, the whole society from its connection with the Methodist Episcopal Church, south, and to

HARPER
vs.
STRAWS.

5. When a trustee shows by his conduct a disposition to violate his trust duties, the chancellor having power over the subject should remove him and appoint another.

HARPER
vs.
STRAWS.

withdraw afterwards a considerable portion of it not only from the connection with the African Methodist Episcopal Church to which he had carried them, but even from the society itself which had worshipped at Asberry Chapel, and to which alone the property belonged. They will find that they have acted under a delusion; that their misdirected efforts, and overheated zeal, have deprived them of the very object for which they were striving, of which there was probably no serious intention to deprive them, and of which they could scarcely have been deprived but by their own act or consent. It is only by re-entering, as they doubtless may do, the society to which the property belongs, that they can regain an interest in it. They may learn from the result of the experiment which they have made, that should their rights of property be hereafter endangered, it is not by violence or disorganizing movements, but by a resort to the laws, that they are to be ascertained and vindicated. They may also learn that they have been acting under a delusion from the fact that the same purpose of securing their property, which had taken them with Harper from the Methodist Episcopal Church, south, and from the African Methodist Episcopal Church, and from their own particular society, has induced Harper, during the progress of this suit, to seek again for himself and them, a re-union with the Methodist Episcopal Church, south, against which their fears were first excited. The defendants also, after the rendition of the decree requiring them to be under the superintendence of the Methodist Episcopal Church, south, have sought a union with that church, and both parties appear to have been partially successful, although, at the latest period to which the evidence refers, it would seem that Harper was again in a state of insubordination, refusing obedience to that church, and not in regular connection with it.

In the facts which have been stated, and in others which might be added, the record contains pregnant

proof that these people ought not to be left wholly to their own guidance in the management of their ecclesiastical affairs and relations; and we have no doubt that their own interests, as well as the peace and order of the community, would be better promoted by their being placed as the decree, while it withholds their property, has placed themselves under the superintendence of an intelligent, conscientious and responsible body of christians, who can now have no motive to deal unfairly by them, and no interest which can excite their jealousy. But it pertains to the legislative, and not to the judicial power, to determine the privileges, and fix the relations of the African race among us. And if the legislature, or those to whom it may entrust the police of the county, deem it expedient to allow religious societies of the African race to act in their assemblies and transactions as societies without restriction or control, we do not perceive that the judiciary has any power to supply what it may deem to be an omission.

We may remark further upon that part of the decree, which requires the action of the Methodist Episcopal Church, south, in the control and superintendence of this society; that said Methodist Episcopal Church was not before the court in this case, and if it were, no ground is shown for assuming any authority over it in the particulars referred to, and the decree makes no provision for the case which might occur, of a refusal to exercise the superintendence indicated in the decree.

Wherefore, upon the errors assigned by Harper, the decree is affirmed; but upon the cross errors assigned by the defendants, so much of the decree as places the society to which the use of the property is decreed, under the superintendence of the Methodist Episcopal Church, south, and requires certain acts to be done by that church, and so much of it as directs the conveyance of the property in contest to be made to Harper, as one of the trustees, is reversed, and the cause is remanded with directions to render a decree

6. An African church holding property as such independent of of any dependance upon any other church organization, cannot, by the chancellor, be subjected to any control or supervision of any such organization to

DICKERSON'S
HEIRS, &c.
vs.
TALBOT'S
EX'ORS., &c.
───────────
which it is not
subjected by the
deed through
which the prop-
erty is held.

providing for a conveyance of the property now in contest, for the use of the society worshipping, or which, at the commencement of this suit, worshipped under the pastoral care of H. S. Revel, as being the same society which formerly worshipped at the church called Asberry Chapel, and that the conveyance be made to trustees belonging to said congregation, or named with the consent of the defendants, and to their successors, to be appointed or approved by the court, and providing further, for delivering the possession of said property to said trustees, for the use of the said congregation or society, if, or when, the authorized expenditures of Harper and his associates, reduced by so much rent as may be properly chargeable to them, may be shown to have been reimbursed.

WILSON and LOGAN for appellants; CATES and HARRISON for appellees.