## Kollmann et ux. v. Latonia Deposit Bank & Trust Co. et al.

(Decided Nov. 11, 1938.)

ROBERT C. SIMMONS for appellants.
MARION W. MOORE for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On August 25, 1928, appellants, Henry Kollmann and wife, Josephine Kollmann, entered into a contract with W. R. Davis and H. B. Salter, a promoting partnership doing business under the name of "Harmony Development Company," by which Kollmann and wife agreed to convey to the partnership or its members certain described suburban land to the City of Covington, for the consideration of $22,200, $200 of which was then paid, and $7,200 was agreed to be paid when conveyance was made pursuant to that contract. The balance of the

consideration was divided into notes of equal amounts, due in one, two and three years from the date of the execution of the future deed.

About a month thereafter, Davis and Salter took into their partnership Dr. R. Lee Bird, who was then and had been for sometime prior thereto president of the Latonia Deposit Bank and Trust Company. The partnership contract by which Bird was taken into the firm was in writing, and it contemplated the admission of Bird as an equal partner in the development of the lands proposed to be conveyed by Kollmann and wife under their contract with Davis and Salter of August 25, 1928.

On October 4, 1928, following the agreement to convey, the parties met in the law office of Omer C. Stubbs, an attorney in Covington, for the purpose of carrying into execution the prior agreement, except Dr. Bird was not then present, but he was represented by his other two partners. On that occasion and at that meeting, not only were the notes executed pursuant to the prior agreement, but two other writings were also prepared, one a deed from Kollmann and wife to appellee "Latonia Deposit Bank and Trust Company, *Trustee*" (our italics), and another one defining the terms of the trust created by that deed, which latter we will refer to in this opinion as the "trust agreement."

The deed stated as a consideration therefor the sum of "one ($1.00) dollar and other good and valuable considerations," but no mention was made therein of the terms of the trust, or the power and authority to be exercised by the trustee. The notes executed simultaneously with the deed were signed by the three partners in the partnership, although it appears that Dr. Bird was then absent, and, of course, he signed them at a later date. The trust agreement was signed by Davis and Salter, as well as Kollmann and his wife, on the date it bears—corresponding with the dates of the notes and the date of the deed to the bank—with indicated blank lines for its signature by Dr. Bird, the other partner, and by the trustee named in the deed. But it seems that Dr. Bird never signed it, nor did he procure his bank to sign it. At the time the agreement to convey was executed by Kollmann and wife, the partners paid to them the $200 provided for in that agreement, and on October 4, when the deed, the trust agreement and the notes

were executed, they paid to the Kollmanns the balance of the cash consideration, amounting to $7,200.

The trust agreement so prepared and signed—as well as so unsigned—set forth the terms of the trust, a part of which says: "That the Third Party, as Trustee, shall under the trust deed hereinbefore referred to, sell and dispose of the whole or any part or parts of said property, for the amounts and upon the terms agreed upon by Second Parties (the partners) and in so doing shall execute and deliver as Trustee, good and sufficient deeds of special warranty, and *shall retain* out of the sums received, *sufficient amounts* to pay off the promissory notes of Second Parties (to the Kollmanns who were the first parties) as same shall fall due, or to pay off said notes before maturity if so directed by Second Parties." (Our emphasis.)

Further provisions with reference to the duties of the trustee, as such, prescribed for its paying the taxes upon the property, and that when the obligations of the partnership to the Kollmanns should all be paid, then the trustee, at the election of the members of the partnership, might continue to hold the title and sell what portion of the land remained unsold, or reconvey it to the members of the partnership.

Following the date of the notes—the deed and the trust agreement, in its unfinished condition—and after the papers had all been delivered to the proper parties, development proceedings were begun by the partnership platting the ground conveyed by the trust deed, and by improving the lots into which the land had been divided in the way of building streets, sidewalks, and the construction of sewers.

The members of the partnership were not possessed of sufficient funds for that purpose, and it seems that a doubt arose between the members of the partnership and the trustee as to whether the latter could advance the necessary funds to make such improvements and obtain a lien upon the land superior to that of the Kollmanns to secure the amounts thereof, if made. Consequently, the members of the partnership (including Dr. Bird, who was president of the bank) applied to Mr. Stubbs, who had drawn all of the former papers, and he informed them, in substance, that the trust agreement— in which he had expressed the intention of the parties

as told to him at the time he prepared it—forbid the bank to obtain a superior lien over that of the Kollmanns in satisfaction of their unpaid notes.

They then had Mr. Stubbs to prepare (on several different occasions) substitute trust agreements, whereby the clause in the one signed by the Kollmanns, saying, "and shall retain out of the sums received, sufficient amounts to pay off the promissory notes of second parties (meaning members of the partnership who had executed the notes) as same shall fall due, or to pay off said notes before maturity if so directed by second parties," was cancelled and eliminated as a part of the terms of the trust. But no one subscribed any such substituted agreements, nor were they ever presented to appellants, nor did they ever have any knowledge of any such efforts to make the change in the original trust agreement as signed by them on October 4, 1928 and by Davis and Salter.

However, on December 7, 1928—in the absence of either appellant or a representative of either—an agreement was prepared by Davis, Salter and Bird, of the first part, and the trustee, Latonia Deposit Bank and Trust Company, of the second part, whereby they agreed to "cut the melon" put into their hands by appellants under the trust deed of October 4, 1928, and to divide it largely between the partnership on the one hand, and the trustee on the other—and all without the knowledge or consent of either of the Kollmanns, or anyone representing them. That agreement prescribed for the members of the partnership to handle the sales of lots as a part of the subdivision project, and which was to be done according "to sales contract to be agreed upon and to become a part of this agreement." It was then provided therein that the trustee should collect the purchase price of the lots, and pay the members of the partnership 25% thereof; that it should finance the improvement of the lots, and out of the remaining 75% of the proceeds of sales, the trustee might retain 4% for its services as trustee. With the remaining 71%, it was to reimburse itself for any advancements made for the improvements; and out of what was left, if any, appellants' notes were to be paid. If any balance existed, it was to be turned over to the members of the partnership who the agreement declared in express terms, to be the only cestui ques trust under the trust deed executed

by appellants to the bank as trustee—all of which made it possible for the Kollmanns to be the holders of the bag, with nothing to go in it, or not a sufficiency to fill it, and to eventually be "left out in the cold," and all of which arrangements were made without their possessing any knowledge whatsoever concerning it.

After the trustee and the members of the partnership had so arranged matters to suit themselves under that ex parte agreement, the project, known in this record as "Harmony No. 2," was launched, and the improvements were made and a number of lots sold. From time to time the bank, as trustee, collected the proceeds, and either it or Dr. Bird, its president, made some payments to the Kollmanns.

The bank later went into liquidation and was taken charge of by the State Banking Commissioner. At that time there was on deposit with it, as a part of its trust funds arising from the sale of lots from the Kollmann property, a sum (composed of cash or purchase money notes) in excess of $12,000, which was more than sufficient to pay the Kollmanns the balance of their debt. Appellants came into an action brought by the liquidator of the bank to settle its affairs and by their pleadings asserted their right to a superior lien upon the trust fund, supra, which was contested by the bank on the ground that, under the agreement of December 7, 1928, it had a superior lien on that fund to reimburse it for the advancements it had made to the partnership for the purpose of improving the involved subdivision.

The settlement action, in addition to presenting the controversies arising out of the project thus far referred to and known as "Harmony No. 2," also embraced some contested matters growing out of a prior similar project between the Kollmanns and the members of the partnership (with the possible exclusion of Bird) and which was known as "Harmony No. 1." But, before the rendition of the judgment appealed from, the parties agreed upon all matters of dispute with reference to "Harmony No. 1," and they passed out of the case, leaving only for our consideration the matters contested relating exclusively to "Harmony No. 2."

After much pleading and many motions presenting questions which we do not conceive to be material to the decisive issue—and after the taking of evidence

bearing upon the terms of the trust created by the Kollmanns at the time they executed their deed to the bank on October 4, 1928—the cause was submitted to the court for determination. It adjudged that the bank had a superior lien on the trust funds in its hands for the balance due it from the partnership—arising from funds furnished by it in making improvements to and upon the subdivision of "Harmony No. 2," over and above the lien of appellants for the balance due them, which the judgment fixed—and from that ruling appellants appeal. The sole question in the case, therefore, relates exclusively to the rights of the parties relating to "Harmony No. 2," since, as we have seen, all matters growing out of "Harmony No. 1" were agreed to, and that agreement was incorporated as a part of the judgment rendered by the court upon final submission.

If the bank had notice of the trust agreement, supra—though only partly executed (but complete so far as the Kollmanns were concerned)—then it must be conceded that the judgment, giving the bank a superior lien on proceeds of sales of lots from that subdivision, was and is erroneous. The trial judge appears to have concluded that the bank had no notice of the contents of that agreement. But, we are clearly convinced that such conclusion was against the great preponderance of the evidence, and can not be sustained by the circumstances and the express testimony in the case.

Bird was president of the bank. He was given possession of the unfinished trust agreement of date October 4, 1928. Nothing had been done, nor, of course, had any money been advanced or expended by the trustees or anyone else at that time, with reference to "Harmony No. 2." If the bank from any source became apprised of the declarations of the donor or creator of the trust as to his intentions and purposes in making it, it then became its duty as trustee to carry out such provisions or understandings. It neither paid, nor promised to pay, any sum whatever in order to be made the vendee in the trust deed. No consideration therefor was paid or agreed to be paid by it under that deed. If it did not desire to assume the execution of the trust, in accordance with the terms expressed in the trust agreement, it had the right to "wash its hands" of the whole affair and "go hence away." That it did have notice of those terms, we are thoroughly convinced.

However, we are not altogether assured but that it became bound to carry out the provisions of the trust existing between the members of the partnership and the Kollmanns, even though it had no express knowledge of its terms when it accepted the deed. We so state because when it accepted the trust deed, wherein there was conveyed to it only the naked legal title to the property described therein, it became its duty to ascertain the terms of the trust, and to then carry out and execute them, if it saw proper to accept the trust; or, if it concluded not to so accept them, to then surrender the title back to the Kollmanns by declining to accept the deed.

Strange as it may seem, the contention of the bank, through its attorney, is sought to be supported under the agreement supra of December 7, 1928, to the occasion of the making of which neither of the Kollmanns was invited, nor did they ever agree to its terms, nor even possess any knowledge of its existence until some time after this litigation started. The court appears to have accepted and approved that contention of counsel for the bank, and to have bottomed its judgment thereon in giving it superiority over the contested fund, and relegating the claim of the Kollmanns to the rear.

In all seriousness, we are entirely unable to follow the argument by which that contention is sought to be upheld, since it is so at variance with the fundamental principles of the law, as we interpret them, as to require no argument in demonstration thereof.

But, it is further contended that the language of the trust agreement, outlining the duties of the trustee, requiring it to "retain out of the sums received (from the sale of lots) sufficient amounts to pay off the promissory notes" of the Kollmanns, does not (standing alone) give a lien to the Kollmanns upon the proceeds of the sales; or, at any rate, that it does not give to them a superior lien over and above any sums that might become due to the trustee in performing its agreement with the partnership to make advancements for improvements.

In the first place, so far as the Kollmanns were concerned, the trustee never had imposed upon it any trust duty of making such advancements. But if it were so contemplated by the Kollmanns that the advancements

should be made by it, then the language of the trust agreement required the trustee to *retain* out of the proceeds of sale a *sufficient* amount to pay the balance of the debt of appellants, and then provided that it should pay the taxes on the land and deduct those amounts from the balance going to the members of the partnership.

Moreover, we are not altogether convinced but that it is competent, where the terms of the particular trust are omitted from the writing creating it, in jurisdictions requiring such writing, to prove the terms by parol testimony, and which the authorities appear to hold is not the creation of the trust, but only a development of its terms, where the creating instrument does not define them. See the text in 65 Corpus Juris, on pages 213-218, 259, 261, 272 and 323; also, Perry on Trust, sections 82 and 83; 26 Ruling Case Law, on pages 1201, 1202 and 1203, and especially section 51 of Volume 1 of Bogert on Trust and Trustees, 1935 edition. That rule appears also to have been approved by this court in the case of Best, Receiver, v. Melcon, 183 Ky. 785, 210 S. W. 662.

It was thoroughly established in this case by the testimony taken and heard (as we appraise it) that a part of the terms of the trust were that Kollmann should have a first lien upon the land sold by him in trust, for the payment of the unpaid portion of his purchase notes. We are also persuaded that the language of the trust agreement—the terms of which we hold were known to the trustee—reserved to Kollmann that right, and that his present contention is supported by that document independently of the testimony he gave, and which other witnesses corroborated by their testimony.

It follows, therefore, that the court erred in rendering that portion of its judgment from which this appeal it prosecuted, and that it should have adjudged appellants the superiority for which they contend. The settlement of the balance due from the Kollmanns to the bank, growing out of matters connected with "Harmony No. 1" and any other indebtedness that may have grown out of "Harmony No. 2," as well as sums due Kollmann by the bank because of his being a depositor therein, or otherwise—should be settled according to the principles of the right of set-off, and a judgment given

him for the balance of his indebtedness, with a superior lien upon the contested fund.

Wherefore, for the reasons stated, the portion of the judgment appealed from is reversed, with directions to set it aside, and to render one in conformity with this opinion.