## Clay et al. v. Crawford et al.

Nov. 24, 1944.

656

Joseph W. Cambron for appellants.

Louis Taylor and Dorsey Brown for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

We are presented with a division in a Methodist Church, the first to reach this court in more than 70 years. And, strange to say, the decision that is all but decisive of the present case is that in which this very congregation was involved 90 years ago. But the cause of the division is one that has vexed the Christian churches for nearly 1900 years. We are told that the members of the new church at Corinth disagreed as to which preacher they should follow. They variously said: "I am of Paul; and I am of Appollos; and I am of Cephas." This dissension called forth the first Epistle to the Corinthians in which St. Paul deplored the breaking of fellowship by the spirit of faction and gave solemn admonition against primary allegiance to any mere man.

The Reverend W. E. Spillman had been pastor for eleven years of Asbury Chapel of the African Methodist Episcopal Church located in Louisville. In October, 1939, the presiding Bishop of the area assigned him to another church and appointed Reverend Peter Crawford in his place. The officers and many members of Asbury Chapel resented the transfer and refused to receive the Reverend Crawford. He filed suit against the trustees seeking to have them enjoined from interfer-

ing with him in the discharge of his duties as pastor. The next day the trustees filed a countersuit of the same character, asking an injunction against the new preacher. There was also a proceeding of forcible detainer in a magistrate's court.

On November 21st a meeting of the trustees, other officers of the church and a large number of the members was held at which a resolution, stated to be that of the "congregation," was adopted declaring their withdrawal from and severance of connection with the Conference of the African Methodist Episcopal Church, and adopting "its old name, namely, Asbury Chapel Methodist Church." It was further declared that the congregation "is now where it was in the beginning, that is, before it joined said Conference, and that it is now an individual, separate church of its own as it was in the beginning when a deed was given at said time, more than 100 years ago, to the Asbury Chapel Methodist Church, which name and identity it has retained since said time. The trustees are now instructed to draw a deed to the Asbury Chapel Methodist Church." This resolution was signed by 156 members. Another resolution had been adopted by "the trustees and stewards of the church, Reverend Spillman and fifty per cent of the congregation" which appointed a new board of trustees (consisting of the members of the old board and four others), and they were authorized to transfer the property to the "trustees of Asbury Chapel Methodist Church." It is to be observed that the only change in the name is the elimination of the word "Episcopal." A deed was executed accordingly the night of the meeting, but it was not put to record. On November 25th another deed identical with the first was executed by the trustees of the connected organization to themselves and the others as trustees of the new independent organization, and this was placed of record. Suit was filed by the Reverend Crawford and others as trustees of the original congregation against J. J. Clay and others, the seceding group, to have those deeds adjudged to be void and cancelled. They prayed that the title be adjudged in the trustees of the original church for the use and benefit of its congregation as provided in the Book of Discipline of the African Methodist Episcopal Church. Appropriate injunctive relief was also asked.

The Board of Incorporators of the African Methodist Episcopal Church, the parent organization, intervened and asked that its title as beneficial owner of the property be quieted, and joined in the prayer of the plaintiffs. The responsive pleading of the defendants, Clay and others, set up their claims to the property and asked appropriate relief.

The suits were consolidated and referred to the master commissioner. He heard evidence and filed an able opinion and report recommending judgment for the original group. Exceptions to the report were overruled and the court rendered judgment accordingly. The new organization and its trustees appeal.

Our several decisions as to the right of contending groups of Methodist congregations arising out of the division between the Methodist Episcopal Church and the Methodist Episcopal Church, South, the questions being as to which group the local organizations should attach, are not apposite for the reason that that division was authorized by a Plan of Separation agreed to in 1844 by the General Conference, which is the highest governing body of the denomination. It may be observed that the merger of the two bodies and the Methodist Protestant Church, in 1939, has received judicial approval. Turbeville v. Morris, 203 S. C. 287, 26 S. E. 2d 821; Purcell v. Summers, D. C., 54 F. Supp. 279. The opinions are useful only as they define the characteristics and powers of local societies of the Methodist Church as a denomination. Of such are Gibson v. Armstrong, 46 Ky. 481, 7 B. Mon. 481; Humphrey v. Burnside, 67 Ky. 215, 4 Bush, 215. Likewise of no applicability are our several opinions dealing with divisions in churches having the congregational form of government without any judicatory with revisory power. Typical of such are Thomas v. Lewis, 224 Ky. 307, 6 S. W. 2d 225, and Clapp v. Krug, 232 Ky. 303, 22 S. W. 2d 1025; Parker v. Harper, 295 Ky. 686, 175 S. W. 2d 361.

With some exceptions with which we are not concerned here, the Methodist Church as a denomination, although having an episcopacy, is not prelatical in form because of the distinctive character of the powers and functions of the bishops, and because it is connectional and governed through representative bodies, called Conferences, but with the congregations acting through local officers having a considerable degree of autonomy in

secular matters. So the Methodist Church is classified as presbyterial in form. Thomas v. Lewis, 224 Ky. 307, 6 S. W. 2d 255; Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666. Its votaries attribute its growth and strength, from the temporal standpoint, to its cooperative connexionalism, of which the itinerant ministry is an important element.

The most basic of all the Methodist bodies for administrative purposes is the Annual Conference, made up of ministerial and lay delegates from the several congregations within a certain area. It is presided over and is under the administration of a Bishop appointed over it annually by the General Conference. The General Conference is the highest body. It is made up of delegates chosen by the Annual Conferences. Its primary function is legislative. It determines the policy, both ecclesiastical and temporal, and its enactments and fiats constitute the law of the church. All subordinate bodies and church members are bound by them. Any of the several traditional Methodist denominations or branches is, therefore, an integrated unit, the many individual congregations or local churches being but parts of an ecclesiastical system. The Discipline of the church is the Book of Law. It contains the declaration of faith and practice, or Articles of Religion; the rules of the church respecting the moral conduct of the members, and the legislation defining the form of government, the duties, powers and privileges of the integral parts and their officers.

All persons becoming members of a Methodist Church by a solemn promise, publicly taken, agree to be bound by and to conform to the church law. It is so provided in the Discipline of the African Methodist Episcopal Church. This law provides that the Bishop in "conjunction with the Presiding Elders" shall appoint traveling preachers to the several churches for one year. The preachers are obligated to go. The implication is that the local societies or churches must accept the one appointed. 54 C. J. 40. The consequence of all this is that the local church is irrevocably bound to the parent body except as its law may permit division or severance. There can be no schism or division in the usual sense in a local Society of the Methodist Church, for in any division there is a secession of one part or group. In an adjudication of rights, the criterion is

identity, not of individuals, but of organization. The question is which of the rival factions is the true representative and successor or continuation of that local society as it existed prior to the division. The answer is to be found by ascertaining which of them adheres to or is sanctioned by the governing or central body. The leading case on this subject is Watson v. Jones, 13 Wall. 679, 20 L. Ed. 666, involving a Presbyterian Church in Louisville, a phase of the division having been considered by this court in Watson v. Avery, 65 Ky. 332, 2 Bush 332. See also Harper v. Straws, 53 Ky. 48, 14 B. Mon. 48; Gibson v. Armstrong, 46 Ky. 481, 7 B. Mon. 481; McKinney v. Griggs, 68 Ky. 401, 5 Bush 401, 96 Am. Dec. 360; First Presbyterian Church of Lousiville v. Watson, 77 Ky. 252, 14 Bush 252; Brown v. Monroe, 80 Ky. 443; Wallace v. Hughes, 131 Ky. 445, 115 S. W. 684; 45 Am. Jur., Religious Societies, Secs. 66, 68; Annotations, 24 L. R. A., N. S., 696; 54 C. J. 75. An interest or beneficial use in the property has been placed with the general church by a compact, indissoluble except according to the terms of the church rules and law or with the consent of the governing body, which, perhaps, may be through estoppel or laches. 45 Am. Jur., Religious Societies, Secs. 66, 68; 54 C. J. 35, Sec. 65. Cf. Newman v. Proctor, 73 Ky. 318, 10 Bush 318.

In the present instance, when the dissatisfaction over the change in pastors was manifested there was an attempt by a designated representative of the Bishop to adjust the differences in a friendly and conciliatory manner, but the opposing group evidenced unbecoming impatience and intolerance and resorted to force to exclude the new pastor. As is well and pertinently said in Bristor v. Burr, 120 N. Y. 427, 24 N. E. 937, 938, 8 L. R. A. 710, 31 St. R. 566, where there was a forcible eviction of a Methodist preacher from his parsonage during a period of suspension:

"This church, being subject to such disciplinary regulations, had not within itself, legitimately, the power to deny to the plaintiff, when so stationed there, the right to exercise his ministerial duties, or to exclude him from its church edifice devoted to that service."

The rejection of the Reverend Crawford and the denial of his right as pastor was, therefore, unwarranted and unlawful under the canonical law. 54 C. J. 29, 60; Whitecar v. Michenor, 37 N. J. Eq. 6; Fuchs v.

Meisel, 102 Mich. 357, 60 N. W. 773, 32 L. R. A. 92. This becomes more apparent when it is noted that there had not then been even an attempt to secede or to transfer the property. That came a month later.

We now consider the question of the title to the property and the authority of the trustees to convey it to the new organization. Waiving a legalistic view, that the conveyance was not authorized by the Quarterly Conference (which is made up of the stewards, trustees and certain other officers of the local church) as prescribed by the Discipline, since it appears that substantially all of them participated in the meeting which undertook to authorize the transfer, we consider the action taken as the equivalent of action by that Conference.

The right of the seceding group to take the property with them is claimed to rest upon two propositions. One is that the congregation was originally an independent church and that it could again, at will, assume the status, irrespective of the tie that bound them to the African Methodist Episcopal Church. The other is that the deed to the property had not been made to the church as an integral part of the main body, but only to the named trustees in fee simple, free from such trust, and that they could dispose of it as they might choose, especially by and with the authority of a majority of the congregation.

We consider the points in the order stated.

We are fortunate in having a judicial record of the beginning of this local church. Its origin and early vicissitudes are given in Harper v. Straws, 53 Ky. 48, 14 B. Mon. 48, an opinion delivered in 1853 by Chief Justice Marshall. At a decretal sale in 1845 of a lot and meeting house of the Methodist Protestant Church located at Fourth and Green (now Liberty) Streets, in Louisville, one Harper was reported as the purchaser for the benefit of the "African Society of Methodists, called 'Asbury Chapel.'" The deed was made to Straws and four others (including Harper) to be held "in trust for the use and benefit of the religious Methodist Society of the African race, now worshipping or which may hereafter worship in said church, now called Asbury Chapel." Harper was the pastor, but the

church was under the superintendence of the Methodist Episcopal Church, South (which had been organized the year before in Louisville less than a square away). Harper chafed under the supervision of the white people and he was expelled. A majority of his congregation adhered to him and they continued to worship in the building for a while as an independent organization. In a short time Harper led his flock into the African Methodist Episcopal Church, which had its principal organization in the free states. Harper was transferred out of the state and the Reverend Revel appointed in his place. After some time Harper was expelled from the African Methodist Episcopal Church for insubordination and returned to Louisville. He induced a number of the members of the Asbury Chapel to unite with him in forming an independent church. This was in July, 1851. Before this the property at Fourth and Green Streets had been sold to the Freemasons, who agreed to erect another meeting house within certain bounds, but it was delayed, apparently because of disagreement as to the location. In October, 1851, the house was completed at Ninth and Walnut Streets. Harper and his congregation filed suit against Straws and the group of which Revel was pastor, claiming the superior right to the new church as they constituted a majority of the members of the original Asbury Chapel, and that they were the society of the African race for whose use and benefit the property on Fourth Street had been conveyed. In the course of the opinion disposing finally of the controversy, it is said (as may be said here):

"Many matters are brought into the case by the pleadings and evidence, which, without throwing any light upon the real issue, show a state of bitter feeling on both sides, which they are calculated to exasperate. The true question is, which of these congregations is the society which worshipped at Asbury Chapel, that is, in the house at the corner of 4th and Green streets, at and after the date of the deed conveying the property to that society. It is a question of identity, not of individuals, but of the body. And as the deed makes no reference to the connection of the beneficiaries, with any other church organization as essential to their rights, the continuance of the connection which existed at its date cannot be regarded as entering into the question of identity, by which it is to be determined who are the beneficiaries.

That question is to be determined by reference to the acts and internal organization of the body itself. Its external relations can, at most, constitute auxiliary considerations only for determining the question of identity as between the parties claiming that identity.''

The decision, affirming the judgment, was that the Harper group was an independent, seceded organization and had forfeited all interest in the property. It was held that the Straws and Revel group was the society for whose use the deed conveyed the property and that notwithstanding they had become a part of the African Methodist Episcopal Church, they were entitled to the property.

It appears that it was this very lot (the original building having burned years ago), located at Ninth and Walnut Streets, that was sold by this congregation of Asbury Chapel in January, 1939, for $9,000 and the proceeds used to purchase the property at Eighteenth and Chestnut Streets, to which they moved, and that which is here involved.

To support the contentions of the appellants that their new organization is but the reversion to the original independent church would be to leap over the continuity of ninety years as a constituent part of the African Methodist Episcopal Church, with all its privileges going along with the restraints. Of course, every member of the Asbury Chapel at this time became such during that period. Stronger is the fact that the original independent group was adjudged *not* to have any right in the property, some of the proceeds of which have found their way into the present property.

In Lewis v. Watson, 67 Ky. 228, 4 Bush 228, the property of a Negro Methodist Church on Centre Street in Louisville had its source of title in three deeds, namely, one to trustees for the use of the Methodist Episcopal Church before the separation in 1844; another to trustees of the Methodist Episcopal Church, South, ''for the use and benefit of the African members,'' and a third to certain colored men, as ''trustees of the Centre Street Methodist Episcopal Church.'' They were all made before Emancipation. A majority of the congregation seceded and joined the ''Methodist organization, North'' (the identity not being disclosed in the opinion), and they evicted from possession and use of the property a

minority who adhered to the Methodist Episcopal Church, South. The several deeds were construed as having been expressly made for the benefit of the colored members who, by the compact of separation and their own acquiescence, became an integral part of the Methodist Episcopal Church, South. It was claimed in the case that there had been a severance of the negroes' connection with that church. Said the court:

"If there had been a valid dissolution, it would be unavailing to the appellants so far as the church property is concerned; for if all the members of the Centre Street Church had repudiated its constitutional dependence and connections and gone north, they could not have taken the property with them, but would have left it as dedicated, to the use and control of the Methodist Episcopal Church, South. And just so the seceding appellants left it to the exclusive use of the adhering appellees as abiding members of the Southern Church."

In Brown v. Monroe, 80 Ky. 443, it was likewise held that the negroes who had occupied and used property conveyed to the Methodist Episcopal Church, South, at Danville, for the use of its colored members and who had joined the African Methodist Episcopal Church, could not take the property with them into that organization. The same property had been involved in Newman v. Proctor, 73 Ky. 318, 10 Bush 318, where the record showed that there were no longer any colored members and the white members had agreed to the action of the colored people. It was declared that the Methodist Episcopal Church, South, had lost for the time at least all right over the property since there were no beneficiaries of that description and that its trustees could not maintain an action to evict the African Methodist Episcopal Church. In the second case coming here, Brown v. Monroe, supra, it was disclosed that there were colored members of the white church, and that decision was based upon the idea that those who had occupied the building had seceded and had, therefore, lost all rights in the property.

In McKinney v. Griggs, 68 Ky. 401, 5 Bush 401, 96 Am. Dec. 360, property had been acquired as a parsonage for a Methodist Episcopal Church, South, and held by certain trustees, although the deed was not according to the usual form for the use and benefit of the church generally, or the Conference specially for the particular

congregation. The named trustees and two-thirds of the congregation withdrew and organized themselves as a congregation of the Northern branch of the Methodist Church and erected a house of worship. They obtained possession of the parsonage and denied the right of those who remained in the old congregation to use or control it. The trustees of the remaining group, adhering to the Southern branch of the church, were held entitled to the property because it had been purchased and appropriated or dedicated as a home for the ministers of that congregation and could not be diverted to another or different object unless by a division of the Society or a partition or apportionment of the property authorized by express law. It was held that those who severed their relations with the church for whose use the property had been acquired and the entire ecclesiastical body, of which it was a part, had lost all rights in it even though they continued to be Methodists and were the trustees named in the deed. The property was ordered to be restored to the original church.

Therefore, unless there is a legal reason for giving the property to those who have left the African Methodist Episcopal Church by reason of the peculiar terms of the deed, it must be held that by their withdrawal they forfeited and cut themselves off from all right to use the property.

The question remains as to the title acquired under the deed executed in 1939.

Generally, title to the property of the local Methodist Church, as it is in the African Methodist Episcopal Church, is lodged in local trustees for the use and benefit not only of the particular congregation, but for all members of the church as a body, for the churches "being many, are of one body." And the local trustees are bound by the terms of the Discipline in relation to such property. They must hold it and may dispose of it only in the manner therein prescribed. The Discipline of this branch of the Methodist Church prescribes a plan "for the security of our meeting houses and premises belonging thereunto." It is to be followed in making or accepting deeds except as it may have to be modified to conform to the laws of any State. The plan submits the form of deed. It contains the provision that the deed shall be to "trustees in trust for the use and purposes hereinafter mentioned." It is prescribed that

the conveyance shall be made to them "and their successors in office, forever in trust," as "a house or place of worship for the use of the members of the African Methodist Episcopal Church in the United States of America, according to the rule and Discipline of said Church, which from time to time may be adopted and agreed upon by the" General Conference. There are other provisions of like effect, emphasizing the trust as being for the whole body of the denomination. It is made the duty of every pastor to see that the provisions of the "plan" are observed.

The Board of Trustees may effect a transfer of church property "in accordance with the provisions of the Articles of Incorporation of the African Methodist Episcopal Church," provided "such transfer has been approved by resolution in the quarterly conference of said church." We have recognized the binding effect of such a provision and held trustees of Methodist Church property cannot sell it except in compliance with the provisions of the Discipline. Smallwood v. Robinson, 204 Ky. 836, 265 S. W. 441. It is further stipulated in the Discipline that, "The proceeds of such sale to be held in trust for the African Methodist Episcopal Church or disbursed for another improvement of such other properties owned by it or to be purchased by it."

When this congregation, Asbury Chapel, sold its property at Ninth and Walnut Streets, it purchased the property of another congregation of this denomination, St. James Church, which was about to be sold for debt. The trustees, apparently in conformity with the Discipline, were authorized to convey the property to Asbury Chapel. But the deed was not prepared in accordance with the form prescribed by the Discipline. This apparently was not due to any design but the insertion of the specific trust provision was overlooked by the pastor, the Reverend Spillman, and other trustees, and the lawyer drafting the deed knew nothing about those terms. The grantees in the deed are J. J. Clay and others, "Trustees of the Asbury Chapel, African Methodist Episcopal Church of Louisville, Ky." That is all there is in the deed disclosing the trust. It is the absence of the trust provisions prescribed by the Discipline and any express designation of the African Methodist Episcopal Church as the cestui que trust, upon which

the appellants rest their claim of power to convey to the trustees of the newly organized independent church.

The fundamental rule in the construction of a trust instrument is to ascertain the intent of the parties, particularly of the trustor. That is to be done from the language employed, read in the light of the contemporary circumstances, the object to be accomplished, and all other attendant facts actually or presumably within the knowledge of the parties. The determination of the beneficiary of this trust deed is quite easy under that rule. We have not only the history and the tracing of funds of the Asbury Chapel of the African Methodist Episcopal Church into this property, but parol evidence of the intention and purpose to transfer the property when it was acquired to that Society of the central organization in the proper and regular way. After the property had been occupied by this congregation, there was a dedication ceremony, which, according to the ritual of the church and oral testimony that it was observed, began with the meeting at the church door of the personal representative of the Bishop by the local officers, where they welcomed him and delivered to him the key to the building, which is an ancient symbolic act transferring property. This parol evidence is competent as identifying the beneficiaries of the trust of which the grantees were designated trustees. McKinney v. Griggs, 68 Ky. 401, 405, 5 Bush 401, 405, 96 Am. Dec. 360; Kollman v. Latonia Deposit Bank & Trust Co., 275 Ky. 347, 121 S. W. 2d 721.

It is sufficient to create a trust where the intention is clearly established and its object distinctly manifested. Its existence may be shown by any writing that connects the trustee with the subject matter of the trust. Thus, in Merriweather v. Petit, 10 Ky. Op. 113, a lot had been conveyed to three men as "trustees of Emanuel Episcopal Church of the Diocese of Kentucky in the city of Louisville," but the deed contained no other words indicating a trust or the uses for which the conveyance was made. A writing had been signed and delivered to the Bishop of the Diocese by the three men as "trustees and church wardens, and vestrymen of Emanuel church" for use of the Protestant Episcopal Church, with the request that he take the property under his jurisdiction. This writing was made in conformity with a canon of that church. The deed was con-

strued as showing with reasonable certainty the intention to create a trust, and when considered in connection with the communication addressed to the Bishop and the law of the church, it was held that every requisite of a trust for the general church had been established. It could not be regarded as having been created for the particular congregation, irrespective of its ecclesiastical connection, so as to warrant a decision that a majority of the congregation had the legal right to take the property with them into another church. It was further held that the congregation had assented to what the trustees had done and were bound by that assent. There had been a service of consecration and it was safely presumed to have been performed in the presence of a large part of the congregation and to have been known to all. In the instant case there was a similar service under the name of dedication. The decision in that case makes it manifest that the trustees named in the deed before us were the trustees of Asbury Chapel as a component part of the African Methodist Episcopal Church, and that the legal title they held was that contemplated by the Discipline describing the character of the trust in which property acquired by one of its local Societies is held. 54 C. J. 61; Sanders v. Meredith, 78 W. Va. 564, 89 S. E. 733; Fuchs v. Meisel, 102 Mich. 357, 60 N. W. 773, 32 L. R. A. 92.

Our conclusion is that the chancellor correctly adjudged that the Reverend Spillman and his followers had forfeited their right to the use and occupancy of the property and that the deeds described were void and should be cancelled. 54 C. J. 70, 73; Kinkead v. McKee, 72 Ky. 535, 9 Bush, 535; Curd v. Wallace, 37 Ky. 190, 7 Dana, 190, 32 Am. Dec. 85.

These wandering sheep should return to the fold and once more dwell together in unity, worshipping God in harmony around a common altar.

Judgment affirmed.

Whole Court sitting.